*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 04a0433p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

BERNARD FIDEL; REICH & TANG ASSET MANAGEMENT
L.P.; STANLEY J. MICAL; LUTGARDA C. MICAL; YITZ
GROSSMAN/YITZ GROSSMAN CHARITABLE TRUST; and
ARNOLD H. SIMON, on behalf of themselves and all
others similarly situated,

       *Plaintiffs-Appellants,*

TOM MAIDEN, on behalf of himself and all others
similarly situated, et al.,

       *Plaintiffs,*

  *v.*

WILLIAM FARLEY; G. WILLIAM NEWTON,

       *Defendants,*

ERNST & YOUNG L.P.,

       *Defendant-Appellee.*

No. 02-6143

---

Appeal from the United States District Court
for the Western District of Kentucky at Bowling Green.
No. 00-00048—Joseph H. McKinley, Jr., District Judge.

Argued: April 21, 2004

Decided and Filed: December 16, 2004

Before: SUHRHEINRICH and GIBBONS, Circuit Judges; LAWSON, District Judge.[*]

---

**COUNSEL**

**ARGUED:** Eric A. Isaacson, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San Diego, California, for Appellants. Stanley J. Parzen, MAYER, BROWN, ROWE & MAW, Chicago, Illinois, for Appellees. **ON BRIEF:** Eric A. Isaacson, Joseph D. Daley, LERACH, COUGHLIN, STOIA, GELLER, RUDMAN & ROBBINS, San Diego, California, Ronald R. Parry, PARRY, DEERING, FUTSCHER & SPARKS, Covington, Kentucky, for Appellants. Stanley J. Parzen, Bradley J. Andreozzi, MAYER, BROWN, ROWE & MAW, Chicago, Illinois, Lora S. Morris, MUSE & MORRIS, Louisville, Kentucky, for Appellees.

---

[*]The Honorable David M. Lawson, United States District Judge for the Eastern District of Michigan, sitting by designation.

————————

## OPINION

————————

JULIA SMITH GIBBONS, Circuit Judge. Plaintiffs-appellants, a class consisting of investors who purchased Fruit of the Loom stock between September 29, 1998, and November 4, 1999 ("Class Period"), filed suit against defendants William Farley, Fruit of the Loom's Chairman, Chief Executive Officer, and Chief Operating Officer; G. William Newton, Fruit of the Loom's Senior Vice President of Finance and Chief Financial Officer; and defendant-appellee Ernst & Young, Fruit of the Loom's auditor, under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Securities and Exchange Commission Rule 10b-5, 17 C.F.R. § 240.10b-5. The plaintiffs alleged in their original complaint that Farley and Newton had knowingly or recklessly misrepresented Fruit of the Loom's condition during the Class Period in a successful effort to artificially inflate the price of the company's stock. They also alleged that Ernst & Young participated in the fraud by knowingly or recklessly issuing an unqualified audit opinion approving Fruit of the Loom's 1998 financial statements and by consenting to that audit opinion's inclusion in investor solicitation materials for a $250 million securities offering.

All three defendants filed motions to dismiss under Federal Rule of Civil Procedure 12(b)(6). The district court denied Farley's and Newton's motions, holding that the plaintiffs had satisfactorily alleged that the two Fruit of the Loom officers had acted knowingly or recklessly (*i.e.*, with scienter) when they made public statements about Fruit of the Loom and its financial condition during the Class Period that did not accurately reflect the company's condition. The district court granted Ernst & Young's motion to dismiss because the plaintiffs failed to adequately plead scienter.

Subsequently, the district court granted leave to amend the complaint. After the plaintiffs filed an amended complaint, Ernst & Young moved to dismiss it with prejudice. The district court granted its motion to dismiss and a motion for entry of final judgment under Federal Rule of Civil Procedure 54(b).

In their appeal to this court, the class members contend that the district court erred in dismissing their complaint because the complaint sufficiently alleges a claim against Ernst & Young under Section 10(b) of the Securities Exchange Act and Rule 10b-5. Alternatively, the class members argue that the district court improperly denied their request to further amend the complaint. For the following reasons, we affirm the judgment of the district court.

I.

Fruit of the Loom, a clothing manufacturer, experienced financial difficulties in the mid-1990s. The company undertook a major restructuring effort beginning in 1995 by outsourcing almost all of its sewing and manufacturing operations from the United States to "maquiladora" plants in the Caribbean and South America. At the same time, it began upgrading its management information, inventory, and production control systems with the consulting assistance of Ernst & Young. The restructuring and systems changes led to significant quality control and inventory management problems. Fruit of the Loom suffered losses of almost $500 million dollars in 1997, and its stock fell from $38 a share in December 1996 to $23 a share in December 1997.

By 1998, it appeared that Fruit of the Loom's financial position was improving. Its stock was selling at over $30 a share in August 1998. The company reported revenues of $1.678 billion, net income of $146.9 million, and earnings per share of $2.04 for the nine months ending September 1998. In addition to reporting these figures, Fruit of the Loom told investors that its inventory and production problems were resolved.

During this same period, Fruit of the Loom announced that it planned to reorganize as a corporation in the Cayman Islands, a move that would lower its corporate tax rate. In order to accomplish the

reorganization, however, Fruit of the Loom needed to redeem $250 million in senior notes that were due in October 1999, but would have their maturity accelerated by the reorganization in the Cayman Islands. Fruit of the Loom did not have the money to repurchase or pay off these notes. It would later participate in a May 1999 securities offering in order to raise the funds necessary to move forward with the reorganization.

Fruit of the Loom's stock fell sharply in September 1998. Although trading at over $30 a share in August 1998, the stock fell to just under $14 a share in late September. Investors voiced concern that Fruit of the Loom was accumulating excess inventories that would hurt future profits.

To address these concerns, Fruit of the Loom told investors that it would materially reduce levels of finished goods and raw materials inventory by slowing production for a few days at its plants. Fruit of the Loom attributed losses suffered during the fourth quarter of 1998 to this downturn in production, but told investors that the inventory reduction would have a long-term favorable impact. The company predicted significant revenue and earnings growth during 1999.

By January 1999, Fruit of the Loom's stock increased to $19 a share. The company forecast continued financial recovery in the following months. William Farley, Fruit of the Loom's Chairman and Chief Executive Officer, told investors that the restructuring, started a few years prior, was essentially complete and that the company was making progress towards an "acceleration of profitable growth." Fruit of the Loom also forecast earnings per share of over $2.00 in 1999 and $2.30 in 2000.

On February 16, 1999, Ernst & Young issued a report to Fruit of the Loom's Board of Directors based on its audit of the company's financial statements. It stated in pertinent part the following:

> We have audited the accompanying consolidated balance sheet of Fruit of the Loom, Inc. and Subsidiaries as of January 2, 1999 and December 31, 1997, and the related consolidated statements of operations, stockholders' equity and cash flows for each of the three years in the period ended January 2, 1999. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.
>
> . . .
>
> In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of Fruit of the Loom, Inc. and Subsidiaries at January 2, 1999 and December 31, 1997, and the consolidated results of their operations and cash flows for each of the three years in the period ended January 2, 1999, in conformity with generally accepted accounting principles.

Ernst & Young subsequently issued an unqualified audit report as to Fruit's 1998 financial statements.

In March 1999, Fruit of the Loom privately placed $250 million of new notes with investors. The private placement was designed to raise the money necessary to proceed with the Cayman Islands reorganization. In May 1999, Fruit of the Loom exchanged the privately placed notes with freely tradeable notes registered with the Securities and Exchange Commission. As part of the issuance of the freely tradeable notes, Fruit of the Loom filed a registration statement. Ernst & Young consented to the incorporation by reference of its audit report reviewing 1998 financial data in the registration statement. It stated in a letter that:

> We consent to the reference to our firm under the caption "Experts" in the Registration Statement (Form S-4) and related Prospectus of Fruit of the Loom, Inc. relating to the exchange offer of $250,000,000 8 7/8% Senior Notes due 2006 and to the use of the report dated February 16, 1999, except for "Subsequent Events" note, as to which the date is

March 25, 1999, with respect to the consolidated financial statements of Fruit of the Loom, Inc. and to the use of our report dated May 21, 1999 with respect to the balance sheet of Fruit of the Loom, Ltd.

We also consent to the incorporation by reference therein of our report dated February 16, 1999, except for "Subsequent Events" note, as to which the date is March 25, 1999 with respect to the consolidated financial statements and schedule of Fruit of the Loom, Inc. included in its Annual Report (Form 10-K) for the year ended January 2, 1999, filed with the Securities and Exchange Commission.

The registration statement incorporating Ernst & Young's audit report dated February 16, 1999 was issued on May 25, 1999.

Fruit of the Loom experienced disappointing financial results throughout 1999. For first quarter 1999, the company reported that sales were $408 million, down $49 million from first quarter 1998. As a result, the stock suffered a loss of $0.13 per share during that time period. Fruit of the Loom explained the results as reflecting an inability to meet strong demand, but told investors that the capacity constraints had been addressed. The company forecast that its 1999 sales would be around $2.0 billion and generate earnings per share of over $1.35.

Despite these assurances, Fruit of the Loom's financial results did not improve during the remainder of 1999. Second quarter yielded a loss of about $.03 a share, although the company represented to investors that it would have better results in the second half of the year and a third quarter profit. However, in November 1999, Fruit of the Loom reported a loss of $166.4 million during the third quarter, leading to a loss of $2.49 a share. One month later, in December 1999, the company filed bankruptcy proceedings.

In March 2000, the plaintiffs-appellants brought suit against William Farley, Fruit of the Loom's Chairman, Chief Executive Officer, and Chief Operating Officer; G. William Newton, Fruit of the Loom's Senior Vice President of Finance and Chief Financial Officer; and Ernst & Young, Fruit of the Loom's auditor, alleging securities fraud violations under Section 10(b) and Rule 10b-5.

The class members brought suit against Ernst & Young because Fruit of the Loom used Ernst & Young during the Class Period to provide auditing, accounting, and consulting services. The class members alleged that Ernst & Young was liable for securities fraud based on its actions in issuing an unqualified audit report on February 16, 1999, with regard to Fruit of the Loom's 1998 financial statements and allowing this report to be incorporated by reference into a registration statement issued on May 25, 1999, in conjunction with the offering of new notes. Also included in the registration statement were unaudited interim financial figures. The class members alleged that the report and the registration statement included false and misleading information in violation of Section 10(b) and Rule 10b-5.

The defendants each filed a motion to dismiss the plaintiffs' complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). The district court denied Farley's and Newton's motions to dismiss. It granted Ernst & Young's motion to dismiss because the plaintiffs had not met the Private Securities Litigation Reform Act's ("PSLRA") pleading requirements. The plaintiffs filed an amended complaint and Ernst & Young again filed a motion to dismiss. The district court granted Ernst and Young's motion because the plaintiffs had not demonstrated that Ernst & Young acted with the requisite scienter. It also denied plaintiffs leave to file a second amended complaint. Plaintiffs filed a timely notice of appeal.

## II.

This court reviews the dismissal of a complaint under Rule 12(b)(6) for failure to state a claim *de novo*. *Miller v. Champion Enters., Inc.*, 346 F.3d 660, 671 (6th Cir. 2003). Dismissal of a claim is not proper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). "The facts set forth in the complaint must be accepted as true, so long as they are well pleaded." *Miller*, 346 F.3d at 671. While the standard for dismissal of a claim is "quite liberal", "more than bare assertions of legal conclusions is ordinarily required to satisfy federal notice pleading requirements." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988). Thus, the plaintiff must provide "either direct or inferential allegations respecting all the material elements [necessary] to sustain a recovery." *Id.* (internal quotation and alteration omitted).

In their complaint, the class members allege that Ernst & Young violated Section 10(b) of the Securities Exchange Act and Rule 10b-5, promulgated under Section 10(b). Section 10(b) makes it unlawful, directly or indirectly, "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe . . . ." 15 U.S.C. § 78j(b). Rule 10b-5 provides:

> It shall be unlawful for any person, directly or indirectly, . . . , (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5. In order to state a claim under Section 10(b) and Rule 10b-5, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 548 (6th Cir. 1999).

The PSLRA imposes heightened pleading requirements on plaintiffs alleging violations of Section 10(b) and seeking monetary damages. The complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). In addition, the PSLRA mandates that for each act or omission alleged to have violated federal securities law, the complaint "state *with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2) (emphasis added). We have explained that the strong inference requirement creates a situation in which "plaintiffs are entitled only to the most plausible of competing inferences," but that it does not mandate that the inference be "irrefutable." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 553 (6th Cir. 2001) (en banc).

The central dispute in this appeal is whether plaintiffs have sufficiently alleged that Ernst & Young acted with the required state of mind; for a claim brought pursuant to Section 10(b) and Rule 10b-5, the required state of mind is scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). We have recognized that recklessness constitutes sufficient scienter for liability to attach under Section 10(b). *Mansbach v. Prescott, Ball & Turben*, 598 F.2d 1017, 1024 (6th Cir. 1979). Recklessness is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care. While the danger need not be known, it must at least be so obvious that any reasonable man would have known of it." *Id.* at 1025. It is "a mental state apart from negligence and akin to conscious disregard." *In re Comshare*, 183 F.3d at 550.

"[W]hen the claim is brought against an outside auditor," we have concluded that "the meaning of recklessness in securities fraud cases is especially stringent." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 693 (6th Cir. 2004). Specifically, "[r]ecklessness on the part of an independent auditor entails a mental state so culpable that it 'approximate[s] an actual intent to aid in the fraud being perpetrated by the audited company.'" *Id.* (quoting *Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111,121 (2d Cir. 1982)). It must be proven, not that there was a deviation from accounting principles, but

> that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.

*Id.* at 693-94 (quoting *In re Worlds of Wonder Sec. Litig.*, 35 F.3d 1407, 1426 (9th Cir. 1994)).

III.

The class members allege that Ernst & Young's first material misrepresentation subjecting it to liability under Section 10(b) and Rule 10b-5 was the unqualified audit report issued in February 1999 for the period ending January 2, 1999. The district court held that the class members failed "to demonstrate that Defendant Ernst & Young acted with the requisite scienter" with regard to the audit report.

On appeal, the class members rely on a number of facts to establish that Ernst & Young acted with scienter. They allege that there were numerous "red flags" that should have placed Ernst & Young on notice about financial improprieties occurring at Fruit of the Loom. Further, they contend that the magnitude of the fraud perpetuated by Fruit of the Loom creates the inference that Ernst & Young acted knowingly or recklessly in ignoring the company's financial misstatements. The class members also argue that the following circumstances support the inference that Ernst & Young acted with the requisite scienter: (1) the close temporal proximity between Ernst & Young's statements about the financial health of Fruit of the Loom and the subsequent financial collapse of the company; (2) the significant fees obtained by Ernst & Young from its work with Fruit of the Loom; and (3) the proliferation of lawsuits against Ernst & Young stemming from its audits of companies later found to have engaged in financial fraud. Finally, the class members contend that these allegations, even if insufficient alone, when viewed in their entirety establish that Ernst & Young acted with scienter. We address these allegations in turn.

A.

The class members point to a number of "red flags" that should have alerted Ernst & Young to "likely improprieties" and conveyed the need for it to engage in a more exacting audit. First, they allege that because Ernst & Young worked as a consultant on several of Fruit of the Loom's internal systems, Ernst & Young was aware of specific problems with these systems. Further, the consulting work allowed Ernst & Young to maintain a presence at Fruit of the Loom's headquarters, frequently talk to Fruit of the Loom management, and have "unfettered access to documents and employees at all of Fruit's offices." Second, they reference a securities fraud lawsuit filed against Fruit of the Loom before Ernst & Young had completed its audit report for the period ending January 2, 1999. Third, the class members allege that Ernst & Young had first-hand knowledge of Fruit of the Loom's "demonstrated propensity to skirt financial rules." This knowledge stemmed from issues that arose during a 1996 audit. Fourth, the class members contend that Ernst & Young received an anonymous letter detailing financial misstatements occurring within Fruit of the Loom's denim unit. Fifth, they allege that Ernst & Young had noted in 1996 audit papers that Fruit of the Loom "demonstrated a trend of significant book to physical losses" over the previous years. They also allege that the 1996 audit revealed that Fruit of the Loom's reserve for close-out inventory was understated by 30 percent. According to the class members, these problems that surfaced first in 1996 contributed to many of the problems that developed in 1998. Sixth, the class members reference $60 million in write-offs that occurred in 1999 as evidence of scienter because another accounting firm,

PricewaterhouseCoopers, discovered these write-offs within a few days of beginning a special audit. Seventh, the class members contend that Ernst & Young knew that Fruit of the Loom granted customers unlimited rights of returns as well as extended payment terms, yet neither of these Fruit of the Loom policies prompted Ernst & Young to engage in a more demanding review during its audit. Finally, the class members argue that Fruit of the Loom and its management demonstrated numerous risk factors that should have led Ernst & Young to add audit procedures to evaluate these risks. The risk factors alleged by the class members include: "an excessive interest by management in maintaining or increasing Fruit's stock price or earnings trend through the use of unusually aggressive accounting practices," domination of management by one person or a small group, and a high dependence on debt.

We find that these red flags do not create an inference of scienter with regard to Ernst & Young's audit of 1998 financial data. It appears that as far as Ernst & Young knew the 1998 financial results were not in question at the time it signed off on them. At least two of the red flags occurred in 1996, two years before the audit in question in this case. Another one of the red flags, the $60 million in write-offs, occurred well after the audit report had been issued.[1] Further, even with regard to red flags that may have occurred in 1998, there is no indication that Ernst & Young knew or could have known that these red flags affected the 1998 financial results. For example, although the class members allege that Ernst & Young knew that Fruit of the Loom granted unlimited rights of returns to certain customers, they pleaded no facts with particularity suggesting that Ernst & Young failed to take this factor into account when preparing its audit or that Ernst & Young knew that the number of actual returns had increased over the previous year. These red flags simply do not create the inference, much less a strong inference, that Ernst & Young, in preparing an audit report of 1998 financial results, acted with scienter. *See* 15 U.S.C. § 78u-4(b)(2) (requiring facts "giving rise to a strong inference that the defendant acted with the required state of mind").

Further, the fact that Ernst & Young served as a consultant to Fruit of the Loom on its computer systems and had access to both confidential documents and upper- and lower-level management does not, without more, lend credence to the allegation that Ernst & Young acted with scienter. Our decision in *PR Diamonds* is instructive. In that case, as in this one, the plaintiffs alleged that the accounting firm had "personnel [who] were regularly present at [the company's] corporate headquarters throughout the class period and had continual access to, and knowledge of, [the company's] confidential financial and business information." 364 F.3d at 695-96. We held that these types of allegations "are not enough to raise a strong inference of scienter because such allegations are insufficiently concrete." *Id.* at 696. However, the more an auditor is intertwined with a company's business, the "more support an inference of scienter takes on." *Id.* (quoting *In re MicroStrategy Inc., Sec. Litig.*, 115 F. Supp. 2d 620, 653 (E.D. Va. 2000)).

In this case, the class members allege that Ernst & Young developed and consulted on internal systems for Fruit of the Loom and that Ernst & Young had "unfettered access" to documents and frequent meetings with management. As in *PR Diamonds*, we find these allegations are "insufficiently concrete" to raise an inference of scienter. Nowhere do the class members allege what Ernst & Young might have learned from its access to the company's confidential information, what Ernst & Young might have known based on its consulting engagement, or even what documents Ernst & Young reviewed as part of its "unfettered access." Further, class members do not allege with particularity that Ernst & Young had any greater access to Fruit of the Loom's confidential information because of its auditing and consulting relationships than would any other auditor or consultant. *Cf. Kennilworth Partners L.P. v. Cendant Corp.*, 59 F. Supp. 2d 417, 429 (D.N.J. 1999) ("[S]tatement[s that] could be made in relation to the auditor of every corporation" are not sufficient to raise the inference of scienter, because "if it were sufficient . . . , it might

---

[1] We observe that the fact that these write-offs were prompted by a special audit undertaken by PricewaterhouseCoopers does not raise an inference of scienter on the part of Ernst & Young because the class members offer no details about the audit undertaken by PricewaterhouseCoopers, nor any specific factual allegations about why Ernst & Young should have discovered these write-offs through its regular audit procedures. *Cf. PR Diamonds*, 364 F.3d at 696 ("Plaintiffs repeatedly attempt to bolster their allegations [of scienter] by pointing out that the outside consultant quickly discovered the accounting irregularities, yet they offer no specific factual details regarding the consultant's work.").

make every auditor liable in cases of securities fraud."). Ernst & Young's consulting and auditing relationships with Fruit of the Loom do not create any inference of scienter on its part with regard to its audit of 1998 financial data.

The class members also suggest that the red flags should have alerted Ernst & Young to perform a more exacting audit of Fruit of the Loom and that Ernst & Young's failure to do so was a "conscious decision" or a result of "severe recklessness." In essence, the class members argue that Ernst & Young did not follow proper audit procedures because it should have been aware that these red flags could affect Fruit of the Loom's reported financial results. We find this argument unavailing. In *PR Diamonds*, we held that a "complaint alleging accounting irregularities fails to raise a strong inference of scienter if it 'allege[s] no facts to show that Defendants knew or could have known of the errors, or that their regular accounting procedures should have alerted them to the errors sooner than they actually did.'" 364 F.3d at 684 (quoting *In re Comshare*, 183 F.3d at 553). Further, the failure to follow generally accepted accounting procedures does not in and of itself lead to an inference of scienter. *In re Comshare*, 183 F.3d at 553 ("The failure to follow GAAP is, by itself, insufficient to state a securities fraud claim."). Even if we assume that Ernst & Young did not follow standard accounting practice in failing to perform a more rigorous audit of Fruit of the Loom's financial results, we cannot infer that it acted with the requisite scienter. The red flags that the class members raise were not so obvious that the strongest inference that can be drawn from them is that Ernst & Young must have deliberately or recklessly ignored them in preparing its audit report. *See id.* at 554 ("Because plaintiffs have failed to plead facts that show that the revenue recognition errors . . . should have been obvious to [the company] or that [the company] consciously disregarded 'red flags' that would have revealed the errors . . ., we conclude the Complaint fails to allege facts that give rise to a strong inference of scienter.").

In short, the class members do not allege with particularity any facts that would show that Ernst & Young knew of or recklessly disregarded these red flags in undertaking the audit. As we have held previously, "claims of securities fraud cannot rest 'on speculation and conclusory allegations.'" *Id.* at 553 (quoting *San Leandro Emergency Med. Plan v. Philip Morris Cos.*, 75 F.3d 801, 813 (2d Cir. 1996)). Because the class members' red flags rest on "conclusory allegations" of what Ernst & Young must have known or should have known while preparing the audit report, we find that they do not create an inference that Ernst & Young acted with scienter.

B.

Next, the class members contend that the magnitude of the financial fraud allegedly perpetuated by Fruit of the Loom bolsters the inference that Ernst & Young acted with scienter. The class members observe that "only after Fruit [of the Loom] completed the $250 million sale of registered notes in 1999 did it belatedly write off $60 million of overvalued and nonexistent inventory." In addition, they allege that Fruit of the Loom ultimately recorded over $220 million of inventory write-downs in 1999, write-downs that resulted from activities begun in prior years.

Some courts have found "an inference of knowledge or recklessness . . . from allegations of accounting violations that are . . . so great in magnitude, that they should have been obvious to a defendant." *PR Diamonds*, 364 F.3d at 684. For example, in *In re MicroStrategy, Inc. Securities Litigation*, the court held that "the alleged GAAP violations and the subsequent restatements are of such a great magnitude—amounting to a night-and-day difference with regard to MicroStrategy's representations of profitability—as to compel an inference that fraud or recklessness was afoot." 115 F. Supp. 2d at 637. Other courts have similarly held that the magnitude of financial fraud can support the finding that a defendant acted with scienter. *See, e.g.*, *Carley Capital Group v. Deloitte & Touche, L.L.P.*, 27 F. Supp. 2d 1324, 1339 (N.D. Ga. 1998) (holding that a misapplication of GAAP "when combined with a drastic overstatement of financial results can give rise to a strong inference of scienter"); *In re Baan Co. Sec. Litig.*, 103 F. Supp. 2d 1, 21 (D.D.C. 2000) (observing that "the magnitude of the error can play a role" in inferring scienter).

We decline to follow the cases that hold that the magnitude of financial fraud contributes to an inference of scienter on the part of the defendant. Allowing an inference of scienter based on the magnitude of fraud "would eviscerate the principle that accounting errors alone cannot justify a finding of scienter." *In re SCB Computer Tech., Inc. Sec. Litig.*, 149 F. Supp. 2d 334, 359 (W.D. Tenn. 2001); *see also In re Comshare*, 183 F.3d at 553 (holding that the failure to follow accounting standards "is, by itself, insufficient to state a securities fraud claim"). It would also allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates. As reasoned by the court in *Reiger v. Price Waterhouse Coopers LLP*,

> Inferring scienter from the magnitude of fraud invites a court to speculate as to the existence of specific (but unpled and unidentified) warning signs that show the accountant acted with scienter. To travel from magnitude of fraud to evidence of scienter, the court must blend hindsight, speculation and conjecture to forge a tenuous chain of inferences . . . .

117 F. Supp. 2d 1003, 1013 (S.D. Cal. 2000).

Further, the fact that Fruit of the Loom allegedly took over $220 million in write-offs during 1999 in no way implies that Ernst & Young acted with scienter while auditing the 1998 financial data. Ernst & Young never issued a restatement with regard to the audit report, implying that even after the write-offs were taken the following year, Ernst & Young did not believe the 1998 financial figures were inaccurate. Even if Ernst & Young had restated the figures used in its audit, this action would not have risen to the level of establishing scienter. We have held that "a subsequent revelation of the falsehood of previous statements" does not imply scienter, because "'[m]ere allegations that statements in one report should have been made in earlier reports do not make out a claim of securities fraud.'" *In re Comshare*, 183 F.3d at 553 (quoting *Stevelman v. Alias Research, Inc.*, 174 F.3d 79, 84 (2d Cir. 1999)). Therefore, it follows that even if Ernst & Young should have included the write-offs in its audit or that the audit report contained false statements because it did not include write-offs occurring during that year, Ernst & Young's actions do not create an inference that it acted with the requisite scienter. The class members simply have not alleged any concrete facts that would lead to a strong inference that the later inventory write-offs, even if great in magnitude, were indicative of Ernst & Young's scienter.

C.

The class members further argue that the court can infer Ernst & Young's scienter through several other circumstances, including the close timing between the audit and Fruit of the Loom's financial downturn, Ernst & Young's motivation to keep Fruit of the Loom as a client, and the lawsuits filed against Ernst & Young stemming from its audit work of other clients being investigated for financial fraud.

The class members contend that the close proximity between Ernst & Young's review of Fruit of the Loom's financial statements and Fruit of the Loom's financial collapse is evidence that Ernst & Young acted knowingly or recklessly during the audit. For example, the class members argue that Ernst & Young should have included a qualification in the audit opinion dated February 16, 1999 that Fruit of the Loom might not last for another year as a going concern.

We reasoned in *Helwig* that one factor of a non-exhaustive list that could be indicative of a knowing or reckless misstatement is the "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information." 251 F.3d at 552. In this case, however, the class members' allegations rest on nothing more than hindsight. The class members appear to be assuming that because Fruit of the Loom experienced financial difficulties within a year after the audit report was issued, Ernst & Young deliberately or recklessly ignored financial information that must have been present during its audit of 1998 financial data. However, this conjecture cannot support the inference of scienter under the PSLRA's pleading requirements because there is no indication from the class members' allegations that Ernst & Young knew or recklessly disregarded information it had before it at the time it issued its audit report.

Without more, inferring scienter from the temporal proximity between Ernst & Young's report and Fruit of the Loom's financial downturn is nothing more than speculation.

In addition, the class members argue that Ernst & Young's desire to keep Fruit of the Loom as a client creates a strong inference of Ernst & Young's scienter. They allege that Ernst & Young reaped significant fees from its relationship with Fruit of the Loom that it did not want to jeopardize by calling attention to Fruit of the Loom's poor financial condition. However, allegations that the auditor earned and wished to continue earning fees from a client do not raise an inference that the auditor acted with the requisite scienter. At best, they set forth a motive for the auditor to have engaged in fraud. Bare allegations of motive are insufficient to adequately plead scienter. As we observed in *Helwig*, "facts presenting motive and opportunity may be of enough weight to state a claim under the PSLRA, whereas pleading conclusory labels of motive and opportunity will not suffice." 251 F.3d at 551. We further clarified in *Comshare* that a plaintiff cannot meet PSLRA's pleading requirements by "alleging facts that illustrate nothing more than a defendant's motive and opportunity to commit fraud." 183 F.3d at 551. The plaintiffs in this case do nothing more than state facts that establish Ernst & Young had a motive to commit fraud; their complaint alleges that Fruit of the Loom was a lucrative client from which Ernst & Young earned millions of dollars each year. While this information suggests that Ernst & Young benefitted from its relationship with Fruit of the Loom, it would be mere speculation to rely on this evidence to establish that Ernst & Young acted knowingly or recklessly in preparing the audit report. *See id.* at 554 (a pleading under the PSLRA cannot rest on speculation or conclusory allegations).

Further, Ernst & Young would always be motivated to maintain positive relations with a current client, and there is no indication that its motive to retain Fruit of the Loom as a client was any different than its general motive to retain business. Absent any allegations that Ernst & Young's fees from Fruit of the Loom were more significant than its fees from other clients or that Fruit of the Loom represented a significant portion of Ernst & Young's revenue, it is difficult to surmise how Ernst & Young's desire to keep Fruit of the Loom as a client would be any different from its desire to keep any client and thus be indicative of fraud. *Cf. PR Diamonds*, 364 F.3d at 690 (observing that courts "distinguish motives common to corporations and executives generally from motives to commit fraud"); *Kennilworth Partners L.P.*, 59 F. Supp. 2d at 429 ("[S]tatement[s that] could be made in relation to the auditor of every corporation" are not sufficient to raise the inference of scienter.).

In addition to the aforementioned allegations, the class members argue that evidence of lawsuits filed against Ernst & Young contributes to the inference that Ernst & Young knowingly engaged in fraudulent conduct. In *Helwig*, we set forth a non-exhaustive list of circumstances that are probative of scienter; included on that list was the "existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit." 251 F.3d at 552. The class members allege in their amended complaint that Ernst & Young paid $335 million to settle a securities fraud action arising out of its audits of Cendant Corporation and $34 million to compensate investors in Informix. Although Ernst & Young was involved in these lawsuits, neither stemmed from its auditing of Fruit of the Loom. Thus, they are not probative of whether or not Ernst & Young acted knowingly or recklessly in preparing its audit report of Fruit of the Loom. These lawsuits simply do not create the strong inference required under the PSLRA to show that Ernst & Young acted with the required state of mind during its review of Fruit of the Loom's financial records.

### D.

Finally, the class members argue that the allegations contained in the complaint combine to create a strong inference of scienter. In their brief, they argue that a "securities-fraud complaint must be considered in its entirety—and merely 'reasonable' inferences may combine to create a strong inference of defendant's scienter." It is true that this court employs a "totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness." *PR Diamonds*,

364 F.3d at 683; *see also In re Telxon Corp. Sec. Litig.*, 133 F. Supp. 2d 1010, 1026 (N.D. Ohio 2000) ("[T]he Sixth Circuit employs a form of 'totality of the circumstances' analysis").

However, even a review of the complaint as a whole does not establish that the class members met the PSLRA's requirement of pleading "*with particularity* facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2) (emphasis added). The class members do not allege any facts that show Ernst & Young knew or should have known that the 1998 financial results were in question at the time it signed off on them. Moreover, Ernst & Young never restated the financial figures, even after inventory write-offs and other financial problems occurred in 1999, suggesting that it did not believe the audit report it issued in February 1999 was a material misstatement of Fruit of the Loom's financial position. The class members rely on conclusory allegations and speculation to assert that Ernst & Young acted with scienter in preparing the audit report; even viewed as a whole, these allegations do not create the inference, much less a strong inference, that Ernst & Young acted with the required state of mind. None of the facts establish that Ernst & Young's "accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, . . . , or that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts," as would be required under the PSLRA and our precedent. *PR Diamonds*, 364 F.3d at 693-94 (internal citation and quotation marks omitted). Without more particular facts, the class members cannot meet the PSLRA's stringent pleading requirements. *See In re Comshare*, 183 F.3d at 553 (holding that "claims of securities fraud cannot rest 'on speculation and conclusory allegations'").

## IV.

The class members also contest the district court's rejection of their attempt to hold Ernst & Young liable for unaudited financials used in Fruit of the Loom's May 1999 offering documents. The class members contend that the district court viewed their allegations too narrowly and that they were additionally contesting Ernst & Young's "knowing consent to the re-publication in the registration statement of its misleading 1998 clean audit opinion which certified false financial statements." Thus, the class members appear to argue that Ernst & Young violated Section 10(b) by allowing Fruit of the Loom to use the 1998 audit opinion and unaudited financial figures from early 1999 in the registration statement.

The district court correctly dismissed class members' claims with regard to the registration statement. The class members failed to plead the particular facts that would indicate that Ernst & Young acted with scienter. Thus, even if we believe that the 1999 consent letter "recertified" the 1998 audit opinion, we do not find that the class members pleaded any facts to suggest that Ernst & Young acted recklessly or knowingly in allowing the 1998 audit opinion to be used in the offering materials. The class members pleaded no facts supporting a strong inference that Ernst & Young knew or should have known in May 1999 that there were material misstatements in the 1998 audit opinion. The fact that Ernst & Young never restated the 1998 audit tends to suggest the opposite, that Ernst & Young never discovered material misstatements in its 1998 audit opinion. Thus, we find that the class members failed to plead with the particularity required under the PSLRA in their allegations that Ernst & Young's consent to use of its 1998 audit opinion in a registration statement violated Section 10(b).

We also find that the class members cannot state a claim under Section 10(b) with regard to the inclusion of the unaudited 1999 financial statements in the registration statement. The class members allege in their complaint that Ernst & Young's consent to the inclusion of the audit report on 1998 financial results "effectively represented" that Ernst & Young approved of the 1999 unaudited interim financials that were listed separately in the offering documents.

The class members' argument is unavailing. Even they admit in their complaint that the registration statement plainly labeled the 1999 figures as unaudited. They quote from the registration statement, which stated the following: "[W]e also present our summary financial data for each of the three month periods

ended March 28, 1998 and April 3, 1999 and as of April 3, 1999. This data is unaudited . . . ." Because the data was unaudited, Ernst & Young did not assist in the preparation or presentation of this financial information, nor did it ever express an opinion about it. It therefore cannot be held liable for making a false statement, because it made no statement with regard to these financial results. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 175 (2d Cir. 1998) ("[B]ecause the press release contained a clear and express warning that no audit had yet been completed, there is no basis for Wright to claim that Ernst & Young had endorsed the accuracy of those results.").

The class members also argue that "Ernst's professional responsibilities required that it take action to try to correct the unaudited financials" and that because Ernst & Young did not take such action, it is liable under Section 10(b) and Rule 10b-5. However, even if Ernst & Young should have updated the interim, unaudited financial figures under accounting standards, this would not be enough to state a claim under Section 10(b) or Rule 10b-5. We have held that the "failure to follow GAAP is, by itself, insufficient to state a securities fraud claim." *In re Comshare*, 183 F.3d at 553. At most, the failure of Ernst & Young to follow accounting standards, if the standards did in fact require it to review interim statements included in the registration statement, constituted negligence, rather than the recklessness or knowledge required to establish scienter. *See In re SmarTalk Teleservices Inc., Sec. Litig.*, 124 F. Supp. 2d 505, 517 (N.D. Ohio 2000) (observing that "[a]n auditor's failure to follow GAAS may demonstrate negligence").

Finally, holding Ernst & Young liable for either its alleged implicit endorsement of the unaudited financial figures or for its failure to insist on a correction to these figures would effectively revive aider and abettor liability in contravention of the Supreme Court's holding in *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.* 511 U.S. 164 (1994). In *Central Bank*, the Supreme Court held that Section 10(b) "prohibits only the making of a material misstatement (or omission) or the commission of a manipulative act." *Id.* at 177. It does not proscribe "giving aid to a person who commits a manipulative or deceptive act." *Id.* Thus, because Ernst & Young itself did not make a material misstatement or omission with regard to the unaudited financials, it cannot be held liable under Section 10(b) even if its failure to insist on revisions to the figures or its consent to the inclusion of the audit report of 1998 financial data can be construed as assisting Fruit of the Loom in engaging in securities fraud with respect to the 1999 unaudited figures. *Central Bank* simply does not allow the result that the class members urge us to reach.

The class members cannot state a claim for securities fraud against Ernst & Young based upon Fruit of the Loom's inclusion of unaudited financial figures in the registration statement. Further, the class members failed to meet the pleading standards of the PSLRA with regard to the unqualified audit report. We therefore affirm the district court's dismissal of their claims brought under Section 10(b) of the Securities Exchange Act and Rule 10b-5.

V.

Because we determine that the district court properly dismissed the class members' complaint against Ernst & Young, we now consider the district court's denial of leave to amend the complaint. In denying the class members leave to amend, the district court stated, "Inasmuch as the Plaintiffs have now had two opportunities to plead their case, that request will be denied." We review a denial of leave to amend for abuse of discretion. *Miller*, 346 F.3d at 671.

Federal Rule of Civil Procedure 15(a) provides that leave to amend "shall be freely given when justice so requires." However, we have held that the PSLRA restricts the scope of Rule 15(a) in the context of securities litigation such that plaintiffs have more limited ability to amend their complaints. *See id.* at 692 ("[W]e think it is correct to interpret the PSLRA as restricting the ability of plaintiffs to amend their complaint, and thus as limiting the scope of Rule 15(a) of the Federal Rules of Civil Procedure."). We have observed that "the purpose of the PSLRA would be frustrated if district courts were required to allow repeated amendments to complaints filed under the PSLRA." *Id.*

As a preliminary matter, we observe that plaintiffs did not file a motion to amend, but rather sought leave to amend in the final section of their response brief opposing the motion to dismiss. We have disfavored such requests, noting in *Begala v. PNC Bank, Ohio, Nat'l Ass'n* that a request for leave to amend "almost as an aside, to the district court in a memorandum in opposition to the defendant's motion to dismiss is . . . not a motion to amend." 214 F.3d 776, 784 (6th Cir. 2000).

In this case, the plaintiffs have had two opportunities to allege facts sufficient to establish that Ernst & Young acted with the requisite scienter. They have failed to do so. Further, there is no indication from the class members about what new facts they would present should they be granted leave to amend their complaint, nor is there any indication that an amended complaint would satisfy PSLRA's pleading requirements. Given these facts as well as our case law establishing that the PSLRA restricts a plaintiff's ability to freely amend a complaint, the district court did not abuse its discretion in denying the class members leave to amend.

VI.

For all the foregoing reasons, we affirm the judgment of the district court dismissing this case and denying plaintiffs' leave to amend.