# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2707

_____

| | | |
|---|---|---|
| In re: Ceridian Corporation Securities Litigation, | * * * | |
| ------------------------------------------------ | * | |
| Western Pennsylvania Electrical Employees Benefits Funds, et al., | * * * | Appeal from the United States District Court for the |
| Plaintiffs - Appellants, | * * | District of Minnesota. |
| v. | * * * | |
| Ceridian Corporation, et al., | * * * | |
| Defendants - Appellees. | * | |

_____

Submitted: April 14, 2008
Filed: September 11, 2008

_____

Before LOKEN, Chief Judge, JOHN R. GIBSON and MELLOY, Circuit Judges.

_____

LOKEN, Chief Judge.

Between February 2004 and April 2005, Ceridian Corporation ("Ceridian"), then a publicly held company, announced that various accounting errors necessitated multiple amendments and restatements of its published financial statements. The Securities and Exchange Commission began investigating Ceridian's accounting practices in early 2004. Later that year, numerous class action complaints were filed against Ceridian and three former corporate officers. The complaints accused

defendants of securities fraud that injured investors by artificially inflating Ceridian's reported earnings and stock price, violating Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5. After the actions were consolidated and lead plaintiffs' counsel selected, the district court[1] dismissed the amended consolidated complaint for failure to state a claim because plaintiffs failed to "state with particularity facts giving rise to a strong inference that the defendant[s] acted with the required state of mind," as required by the Private Securities Litigation Reform Act ("PSLRA"), codified at 15 U.S.C. § 78u-4(b)(2). In re Ceridian Corp. Sec. Litig., 504 F. Supp. 2d 603 (D. Minn. 2007). Two weeks later, the Supreme Court clarified this pleading requirement in Tellabs, Inc. v. Makor Issues & Rights, Ltd., 127 S. Ct. 2499 (2007). Plaintiffs timely appealed without asking the district court to reconsider its ruling in light of Tellabs. After careful review of the lengthy complaint, we conclude that the district court's thorough and well-reasoned opinion was consistent with both Tellabs and controlling Eighth Circuit decisions. Therefore, we affirm.

## I.

The PSLRA did not prescribe a standard of fault for private damage actions under § 10(b) and Rule 10b-5. Rather, Congress imposed a heightened requirement for pleading "the required state of mind." 15 U.S.C. § 78u-4(b)(2). In Tellabs, the Supreme Court confirmed that the substantive standard continues to be "scienter, *i.e.*, the defendant's intention 'to deceive, manipulate, or defraud,'" 127 S. Ct. at 2504, quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 n.12 (1976); see Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc., 128 S. Ct. 761, 768 (2008). In this circuit (and others), a plaintiff may satisfy the scienter element with proof of severe recklessness, that is, "highly unreasonable omissions or misrepresentations that . . .

---

[1]The HONORABLE PATRICK J. SCHILTZ, United States District Judge for the District of Minnesota.

present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it." Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 654 (8th Cir. 2001) (quotation omitted). The Supreme Court again left this recklessness issue unresolved in Tellabs. 127 S. Ct. at 2507 n.3. Accordingly, our prior decisions that scienter includes severe recklessness continue to be controlling. See Cornelia I. Crowell GST Trust v. Possis Med., Inc., 519 F.3d 778, 782 (8th Cir. 2008).

Prior to Tellabs, we frequently applied the PSLRA's "strong inference" pleading requirement without defining the quantum of pleaded facts that gives rise to an inference that is "strong." See Kushner v. Beverly Enters., Inc., 317 F.3d 820, 827 (8th Cir. 2003) ("Congress did not codify any particular methods of satisfying" this heightened pleading requirement); Green Tree, 270 F.3d at 654-60 (noting disagreement among other circuits but declining to adopt a particular formulation); In re Navarre Corp. Sec. Litig., 299 F.3d 735, 745 (8th Cir. 2002) (same). The district court accurately summarized our prior decisions on this issue: "'Strong' means 'strong.' Under the [PSLRA], it is not sufficient for the facts alleged to give rise to a weak or plausible or even reasonable inference of scienter." 504 F. Supp. 2d at 615.

In resolving a conflict among other circuits, the Supreme Court in Tellabs both confirmed the district court's plain-meaning observation that "strong means strong," and added an additional hurdle for Eighth Circuit plaintiffs to overcome to satisfy this pleading requirement. Not only must a plaintiff state with particularity facts giving rise to an inference of scienter that is strong when viewed in isolation, the inference "must be more than merely plausible or reasonable -- it must be cogent and *at least as compelling as any opposing inference of nonfraudulent intent*." 127 S. Ct. at 2504-05 (emphasis added). We must of course consider the district court's decision in light of this supervening controlling decision.

-3-

We review the district court's dismissal of a securities fraud complaint under the PSLRA *de novo*, considering the complaint in its entirety and accepting its fact allegations as true, but also considering "plausible opposing inferences." In re NVE Corp. Sec. Litig., 527 F.3d 749, 751-52 (8th Cir. 2008). In resolving the Tellabs case on remand from the Supreme Court, Judge Posner observed, "To judges raised on notice pleading, the idea of drawing a 'strong inference' from factual allegations is mysterious." Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702, 705 (7th Cir. 2008). But as the Seventh Circuit recognized, it is an inquiry that must be made, however awkward or unusual, because it has been mandated by Congress to remedy widespread abuses of the Rule 10b-5 class action device.

## II.

Plaintiffs' consolidated complaint accuses Ceridian, Chief Executive Officer Ronald Turner, Chief Financial Officer John Eickhoff, and Controller Loren Gross of "a massive accounting scheme to inflate Ceridian's financial results and its stock price" by exploiting a weak or corrupt system of internal controls to commit numerous violations of Generally Accepted Accounting Principles (GAAP). The complaint alleges that Ceridian announced that it was restating its financial statements five times in 2004 and 2005,[2] and that it calibrated the restatements to "leak this information in bits and pieces to walk the stock price down, thereby avoiding the catastrophic impact of a single cumulative disclosure of massive accounting violations." As a result, Ceridian's initial reported earnings were significantly overstated from the third quarter of 2003 through the third quarter of 2004. Plaintiffs seek to represent investors who purchased Ceridian stock between April 17, 2003, when Ceridian announced its

---

[2]The complaint focuses on five public announcements. Ceridian filed three formal restatements of its financial restatements with the SEC on March 15, 2004, February 18, 2005, and April 21, 2005.

results for the first quarter of 2003, and March 17, 2005, when Ceridian announced that would be restating its financial statements for the first three quarters of 2004.[3]

The district court described the case as "a sprawling jumble of a securities-fraud action . . . based on dozens, if not hundreds, of accounting errors -- errors of many different types committed by many different employees over many different years." 504 F. Supp. 2d at 606. The restatements resulted from a variety of unrelated errors and rule changes involving numerous accounting issues -- when to recognize revenues from the sale and servicing of stored value cards used by retailers; when to expense rather than capitalize the cost of internally-developed software; may up-front services revenues be recognized before the contract is accepted by the customer and various costs related to those services have been incurred; were "special restructuring charges" over-reserved in the 1980s and 1990s and were other accruals misstated; the failure to maintain records required to treat derivatives as "cash-flow hedges" under special hedge accounting rules; improperly offsetting trade receivables against customer advances and customer deposits against related liabilities; misclassifying a vendor account payable as a reduction in liabilities rather than an asset; misclassifying receivables as current assets; how to account for revenues from transactions involving third-party vendors; whether to recognize revenues from year-end sales of equipment not yet delivered and accepted; misclassifying operating expenses as selling, general, and administrative or research and development expenses; failing to accelerate the amortization of a trademark not being used; failure to recognize rent increases on a straight-line basis over the term of the lease; and improperly accounting for acquisitions made in the UK in 1995 and in Canada in 1998. The district court's

---

[3]On the first day of the class period, the price of Ceridian's publicly traded stock was $13.55. The stock fluctuated over the two-year class period, peaking in mid-2004 at over $23.00 per share and closing at $16.87 on March 29, 2005, twelve days after the end of the period. In September 2007, the business press reported that Ceridian's shareholders had accepted an offer of $5.3 billion, or $36 per share, to take the company private.

opinion summarized these errors and the five restatements in detail. See 504 F. Supp. 2d at 606-10.

## III.

The district court first rejected plaintiffs' primary contention "that the sheer number of violations, and the magnitude of the restatements, give rise to an inference that defendants were at least severely reckless." Id. at 616. Section 10(b) and Rule 10b-5 prohibit fraud, not accounting malpractice, the court correctly observed. "If one makes a list of the numerous alleged GAAP violations -- and then, with respect to each violation on the list, looks for *specific* allegations in the complaint linking one of the individual defendants to the violation -- one will almost invariably come up empty handed." Id. at 617 (emphasis in original). This analysis is consistent with our prior decisions applying the PSLRA. See Kushner, 317 F.3d at 831 ("Allegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent."). Because GAAP is an "elaborate hierarchy" of sources that accountants consult, rather than a "canonical set of rules," In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 890 (8th Cir. 2002) (quotation omitted), pleading an amalgam of unrelated GAAP violations, without more, does not give rise to a strong inference of scienter. See Cent. Laborers' Pension Fund v. Integrated Elec. Servs. Inc., 497 F.3d 546, 552, 555 (5th Cir. 2007). Without something more, the opposing inference of nonfraudulent intent -- that these were mistakes by accounting personnel undetected because of faulty accounting controls -- is simply more compelling. Plaintiffs argue that the district court failed to view their allegations of scienter collectively, as Tellabs and our prior cases require. This argument is frequently made but rarely persuasive. When a party asserts, for example, that six factors collectively warrant a particular conclusion, we do not assume the district court failed to view the six collectively merely because it discussed them one at a time.

The district court then addressed in detail whether plaintiffs alleged specific additional facts that, *in toto*, give rise to a strong inference of scienter.

1. The complaint alleged that CFO Eickhoff and CEO Turner sold over 200,000 shares of Ceridian stock in May and September 2003, when they had sold no stock for four and three years, respectively. They also earned substantial year-end bonuses in 2003 based primarily on earnings and revenue growth. (Ceridian withheld their bonuses in 2004 due to the company's poor performance.) Plaintiffs alleged that the motive to maximize insider trading profits and year-end bonuses raises a strong inference of scienter. The district court concluded that the timing of the insider trades was not suspicious, and the amounts of the bonuses were insufficient to raise a strong inference of scienter. 504 F. Supp. 2d at 617-18.

On appeal, plaintiffs argue that the insider trading and year-end bonuses contribute to a strong inference of scienter. "[I]nsider stock sales are not inherently suspicious; they become so only when the level of trading is dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from the undisclosed information." Cornelia I. Crowell, 519 F.3d at 783 (quotation omitted). Controller Gross, the officer with the closest connection to the accounting errors, sold none of his Ceridian shares during the class period. Ceridian notes that Eickhoff and Turner sold "in the money" shares held in options about to expire, and that these executives increased their total share holdings during the class period. Moreover, Turner's and Eickhoff's sales occurred before publication of reported earnings for any of the five quarters whose reported earnings were allegedly inflated. If they intended to "cook the books" to increase insider trading profits, why would they only sell shares *before* the books were cooked? See Greebel v FTP Software, Inc., 194 F.3d 185, 206 (1st Cir. 1999). Nor were the year-end bonuses sufficiently unusual in timing or amount to give rise to a strong inference of scienter. Compare Kushner, 317 F.3d at 830 ($630,000), with Green Tree, 270 F.3d at 661, 664 ($102,000,000). In these circumstances, we agree with the district court that these

purported allegations of motive do not give rise to or even support a strong inference of scienter.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 540-41 (3d Cir. 1999).

2. The complaint also included allegations by five former Ceridian employees, described as three confidential witnesses and two whistleblowers. "CW1" and "CW2" alleged that Gross was responsible for accounting policies and procedures and reported directly to Eickhoff, and that Turner and Eickhoff personally approved all capital expenditures and large expenses and regularly attended meetings where SEC investigations, accounting errors, and restatements were discussed.  The district court concluded these allegations raised no inference of scienter because it "could have surmised as much from the individual defendants' job titles." 504 F. Supp. 2d at 619. "CW3" alleged that Gross and Eickhoff made strategic decisions regarding the capitalization of software expenses.  As CW3 left the company in 2001, well before the start of the class period, the court concluded that these allegations raised no inference "without more detail about the specific software projects or the actual decisions." Likewise, the court concluded, the unspecific allegations of "W2" did not "appreciably add to the evidence supporting an inference of scienter." Id. We agree.

The most specific allegations concerned "W1," a former Director of General Accounting who was fired in late 2004 after an audit committee concluded that "her tolerance for GAAP violations was unacceptable."  W1 filed a whistleblower complaint with OSHA alleging that she was in fact fired in retaliation for her 2001 complaints to unreceptive Ceridian officers, including Gross, about accounting improprieties intended to increase Ceridian's reported revenues.  OSHA investigated this complaint and found that the issues W1 complained about in 2001 were "investigated, corrected, and resolved," and that W1 was properly fired for unrelated "inappropriate deferral of expenses that inflated [Ceridian's] financial information in violation of GAAP." W1 and Ceridian then settled her OSHA complaint.  The district court concluded that "W1's allegations do not give rise to a strong inference that

Gross had the requisite state of mind, even with respect to the 2001 accounting errors, much less with respect to the errors that occurred years later." Id.

On appeal, plaintiffs argue at length that the district court erred in concluding that W1's allegations give rise to no strong inference of scienter. But W1's allegations concerned accounting issues in 2001, well before the class period, and OSHA found that Ceridian had "investigated, corrected, and resolved" those allegations. Moreover, we agree with the district court that W1's 2001 allegations show "[a]t most, that Gross disagreed with her interpretation of GAAP." Id. In these circumstances, W1's allegations do not give rise to a strong inference that defendants knew, years later, that Ceridian's initial 2003 and 2004 financial statements were materially false because they were based upon GAAP violations.

3. Plaintiffs next argue that the district court erred by ignoring their allegations that Ceridian filed sworn Sarbanes-Oxley Act certifications[4] in May 2003 and subsequent quarters declaring that Turner, Eickhoff, and Gross had designed and evaluated Ceridian's internal controls to ensure their effectiveness, identified and disclosed to auditors any material weaknesses and significant deficiencies in the internal controls, and reviewed Ceridian's quarterly reports and found them accurate. The certifications must have been false when made, plaintiffs assert, given Ceridian's subsequent public admissions that it must improve "internal controls and training" and make personnel changes, and that its Audit Committee found substantial accounting deficiencies in 2005. We disagree.

---

[4]The Act requires the principal executive and financial officers to certify in each annual and quarterly report that "based on such officer's knowledge, the . . . financial information included in the report, fairly present[s] in all material respects the financial condition and results of operations of the issuer as of, and for, the periods presented in the report." 15 U.S.C. § 7241(a)(3).

Allegations that accounting errors were discovered months and years later do not give rise to a strong inference that the certifications were knowingly false when made. "Without allegations of particular facts demonstrating how the defendants knew of the scheme at the time they made their statements of compliance, that they knew the financial statements overrepresented the company's true earnings, or that they were aware of a GAAP violation and disregarded it, a showing in hindsight that the statements were false does not demonstrate fraudulent intent." Kushner, 317 F.3d at 827. Plaintiffs fail to allege *specific facts* giving rise to an inference that Turner, Eickhoff, or Gross knew in May 2003 that Ceridian's internal accounting controls were deficient. In these circumstances, the opposing inferences of inadvertent mistake or mere negligence are more compelling. Indeed, if an allegation that a mandatory Sarbanes-Oxley certification was later proven to be inaccurate is sufficient to give rise to the requisite strong inference, "scienter would be established in every case where there was an accounting error or auditing mistake by a publicly traded company, thereby eviscerating the pleading requirements for scienter set forth in the PSLRA." Cent. Laborers' Pension Fund, 497 F.3d at 555 (quotation omitted).

4. Plaintiffs further argue that the district court erred in giving no weight to the on-going SEC investigation because no hearing or adverse findings ensued, and no weight to the forced departures of Eickhoff and Gross and the firing of fourteen employees for GAAP violations in December 2004. Plaintiffs argue it is implausible that fourteen mid-level accounting personnel cooked the books but the CEO, CFO, and Controller did not. The flaw in this argument is that the opposing inferences -- that the SEC investigation uncovered no evidence of fraud, and that accounting personnel and corporate officers responsible for the accounting function were fired or forced to depart for incompetence, not fraud -- are more compelling in the absence of particular facts giving rise to a strong inference of fraud. Without more, these allegations do not show that the accounting mishaps were at least as likely to be deliberate or severely reckless as merely negligent.

## IV.

In summarizing this case the district court observed, "Given the course of conduct described . . . a course of conduct involving dozens of employees committing hundreds of unrelated accounting errors of many different types over many different years -- it seems almost inconceivable that there could have been *any* unifying intent behind the errors, much less an intent to defraud. The allegations in the complaint reek of incompetence, not fraud." 504 F. Supp. 2d at 616. After careful review of the record, we agree. Viewed collectively, the complaint's allegations fail to state with particularity facts that give rise to a strong and cogent inference that any of the defendants acted with intent to defraud or were severely reckless. More compelling is the opposing inference that Ceridian and the controlling officer defendants *should have known* about the many accounting errors affecting many areas of the corporation. That is a viable claim of negligence, but not of fraud. See Green Tree, 270 F.3d at 654. Accordingly, the judgment of the district court is affirmed.

_____