# United States Court of Appeals
### For the Eighth Circuit

_____

No. 14-1947

_____

Thomas Podraza; Dennis Doucet; Jan Arnett; Douglas Keehn

*Plaintiffs - Appellants*

Patriot Coal Investor Group; Ernesto Espinoza, on behalf of himself and all others
similarly situated; John Ziants; James Schmitt; Karel Rybacek; Douglas Combs;
Furman Jerry Rogers, III, individually and on behalf of all others similarly situated

*Plaintiffs*

Kevin Lowery, individually and on behalf of all others similarly situated

*Plaintiff - Appellant*

v.

Richard M. Whiting; Mark N. Schroeder

*Defendants - Appellees*

James Karas; Denis Dehne; Cambridge Retirement System; Richard Sitko

*Movants*

_____

Appeal from United States District Court
for the Eastern District of Missouri - St. Louis

_____

Submitted: January 15, 2015
Filed: June 22, 2015

_____

Before WOLLMAN, SMITH, and SHEPHERD, Circuit Judges.

_____

SHEPHERD, Circuit Judge.

This appeal concerns a securities fraud class action brought on behalf of all persons who purchased or acquired Patriot Coal Corporation securities between October 21, 2010, and July 9, 2012 ("Plaintiffs"). The defendants are Richard Whiting and Mark Schroeder, Patriot's former Chief Executive Officer and former Chief Financial Officer, respectively ("Defendants").

In September 2010, a federal district judge in West Virginia ordered Patriot to install environmental remediation facilities at two of its mines. Beginning in October 2010 and continuing until May 2012, for accounting purposes, Patriot recorded the facilities' installation costs as capital expenditures. After corresponding with the Securities and Exchange Commission ("SEC") over a period of months about this accounting treatment, however, Patriot restated its financial documents in May 2012 to recognize the installation costs as expenses. The restatement caused Patriot's asset retirement obligation expense and net loss to increase by $49.7 million for 2010 and $23.6 million for 2011. Patriot's share priced dropped after the restatement. The company filed for bankruptcy in July 2012.

Plaintiffs subsequently brought this action, alleging Defendants violated sections 10(b), 20(a), and 20(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq., as well as SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs argued Defendants fraudulently capitalized the environmental remediation

facilities' installation costs to avoid the impact expensing the costs would have on Patriot's bottom line. Defendants moved to dismiss Plaintiffs' complaint under Federal Rule of Civil Procedure 12(b)(6) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4. The district court[1] granted the motion to dismiss, finding Plaintiffs failed to meet the PSLRA's heightened requirement for pleading scienter. Plaintiffs now appeal the dismissal of their complaint, arguing the district court's scienter ruling was in error. Because we find the more compelling inference is that Defendants did not act with fraudulent intent, we agree with the district court that the facts alleged do not give rise to the required strong inference of scienter. We affirm.

I.

"Because this appeal arises from the district court's grant of a motion to dismiss, we draw the relevant facts from the class complaint." Elam v. Neidorff, 544 F.3d 921, 925 (8th Cir. 2008). We also consider "other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." Tellabs, Inc. v. Makro Issues & Rights, Ltd., 551 U.S. 308, 322 (2007). Plaintiffs do not dispute that we may consider Patriot's SEC filings and its SEC correspondence to establish what Patriot wrote in those documents.

Patriot is a coal mining company based in St. Louis, Missouri, with chief operations in the central and eastern United States. In 2008, Patriot acquired the Apogee and Hobet surface mines in West Virginia. At the time of the acquisition, the mines were subject to environmental litigation in the Southern District of West Virginia. The plaintiffs in the environmental suits alleged that the mines discharged

___

[1]The Honorable Stephen N. Limbaugh, Jr., United States District Judge for the Eastern District of Missouri.

selenium, a naturally occurring yet potentially toxic element, into water runoff. The selenium discharge levels allegedly exceeded limits set in applicable state mining permits, and the environmental plaintiffs sued to enforce compliance.

Patriot entered consent decrees with the plaintiffs in the environmental suits in March 2009, agreeing to bring the Apogee and Hobet mines into compliance with specific selenium discharge levels by April 2010. As part of its subsequent effort to reduce selenium discharge levels at the mines, Patriot installed water treatment technology it refers to as Zero Valent Iron ("ZVI"). Patriot recorded all the costs associated with the ZVI technology, which amounted to about $20 million, as expenses.

In September 2010, however, because the ZVI technology proved ineffective in sufficiently lowering the selenium discharge levels, the West Virginia district court ordered Patriot to install a Fluidized Bed Reactor ("FBR") facility at the Apogee mine and to submit and implement a treatment plan for the Hobet mine. After evaluating several alternative technologies, Patriot proposed to install an Advanced Biological Metals ("ABMet") facility at the Hobet mine. We follow the parties and the district court in referring to Patriot's court-ordered obligations to install the FBR and ABMet facilities as the "Remediation Obligations."

On October 21, 2010, the first day of the class period, Patriot issued a press release announcing that it had been ordered to install the FBR facility and that it would recognize the facility's installation costs as a $50 million capital expenditure and its operating costs as a $20.7 million expense. After Patriot selected the ABMet facility for the Hobet mine, it disclosed it would recognize that facility's installation costs, which it estimated at $25 million, as capital expenditures as well. In subsequent public filings with the SEC—including in Form 10-Qs filed in November 2010, May 2011, and August 2011, as well as in its 2010 Form 10-K—Patriot

reiterated it would recognize the Remediation Obligations' installation costs as capital expenditures and issued financial statements to that effect.

In September 2011, the SEC's Division of Corporate Finance sent Patriot a letter questioning this accounting treatment. The letter opened an eight-month dialogue between Patriot and the SEC. During that time, the SEC sent six letters to Patriot, all addressed to Whiting. Patriot responded with six letters of its own: four signed by Schroeder and two signed by Patriot Vice President Christopher Knibb. In its letters, Patriot provided detailed explanations of its accounting treatment. It stated it believed its accounting complied with "authoritative" accounting guidance, and in particular with Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 410-30. According to Patriot, ASC 410-30 allows companies to capitalize expenses for "tangible assets acquired to clean a particular spill . . . to the extent that those tangible assets have future uses." J.A. 178. Patriot maintained it properly capitalized the Remediation Obligations' installation costs because it expected the Remediation Obligations to address "current and future selenium discharge limit exceedances." J.A. 178.

Patriot also told the SEC that ASC 410-30 supported its decision to capitalize the Remediation Obligations' installation costs but not the ZVI technology's costs. Patriot stated the FBR facility would "fill an area approximately 670 feet in length and approximately 190 feet wide." J.A. 201. Given its size, the FBR facility would be "located farther down the valley where wider construction areas are available." J.A. 199. This placement "centrally located [the FBR facility] near active and potential, future operations." J.A. 199. By contrast, "ZVI water treatment tanks are more commonly located in areas adjoining the affected outfalls because they require a significantly smaller amount of evenly graded land." J.A. 199. Further, the FBR facility would contain "large steel tanks and other infrastructure that is designed to have a long lifespan." J.A. 201. "Comparatively, the ZVI tanks are plastic tanks. .

. . The tanks were not constructed to withstand significant water flow over multiple years."  J.A. 201.

In February 2012, while its dialogue with the SEC was ongoing, Patriot filed its 2011 Form 10-K and again disclosed it was capitalizing the Remediation Obligations' installation costs.  It also disclosed it had received comments from the SEC regarding this accounting treatment and that the comments were unresolved. Ernst & Young LLP, Patriot's independent auditor, issued an audit opinion accompanying the 2011 Form 10-K.  The audit opinion, which included an assessment of "the accounting principles used," concluded that Patriot's 2011 year-end financial statements "present fairly, in all material respects, [Patriot's] consolidated financial position" "in conformity with U.S. generally accepted accounting principles."  J.A. 308.  It also "expressed an unqualified opinion" of Patriot's "internal control over financial reporting."  J.A. 308.

Nevertheless, the SEC continued questioning Patriot's accounting treatment. And in a letter to the SEC dated May 8, 2012, Patriot agreed to restate its financial documents.  Thus on May 8, 2012, Patriot filed a Form 8-K disclosing it would restate its 2010 and 2011 consolidated financial statements to recognize the Remediation Obligations' installation costs as expenses. Patriot explained the change was necessary because the "primary use [of the Remediation Obligations] will be to treat selenium exceedances in water discharges resulting from past mining under legacy permit standards."  J.A. 314.  The restatement caused Patriot's asset retirement

obligation ("ARO") expense[2] and net loss to increase by $49.7 million for 2010 and $23.6 million for 2011. Patriot's share price dropped the following day.

The May 8, 2012 Form 8-K also contained a revenue forecast for 2013. On May 15, 2012, however, Patriot filed another Form 8-K revising the forecast downward "[b]ased on recent developments involving the potential default by a key customer." R. Doc. 51, at ¶ 57. Patriot's share price dropped on May 15, 2012. Then on May 22, 2012, Patriot issued a third Form 8-K, this time publishing a letter from Whiting to Patriot employees acknowledging Patriot's struggle to secure capital but noting Patriot was working to restructure its debt. Patriot's share price dropped on May 22, 2012. On July 9, 2012, Patriot issued a press release announcing it "and substantially all of its wholly owned subsidiaries [had] filed voluntary petitions for reorganization under Chapter 11 . . . to undertake a comprehensive financial restructuring." R. Doc. 51, at ¶ 61. The press release stated Patriot had been hampered by "reductions in U.S. thermal coal demand," "challenging environmental regulations affecting the cost of producing and using coal," and "weaker international and domestic economies." R. Doc. 51, at ¶ 61. The press release also acknowledged that Patriot's "liquidity and financial flexibility" had been constrained by, among other things, "rising expenditures for environmental and other liabilities." R. Doc. 51, at ¶ 61.

Three separate securities fraud class actions were filed against Defendants later in 2012. Following procedures set forth in the PSLRA, the district court consolidated

---

[2]The complaint states that "[a]n ARO is a liability recorded to acknowledge and measure the present value of the obligation in the future to incur cost to retire a given tangible asset. The obligation typically arises because of a contractual or governmental requirement to remove the asset and restore the property on which the asset sits to a condition comparable to the condition of the property prior to the construction of the asset. The obligation typically includes the cost of environmental mitigation associated with removal of the asset." R. Doc. 51, at ¶ 9 n.3.

the cases and selected lead plaintiffs, who subsequently filed a consolidated class action complaint against Defendants on behalf of themselves and all persons who purchased or acquired Patriot securities between October 21, 2010, and July 9, 2012. Plaintiffs claimed a number of Defendants' statements about or involving the Remediation Obligations were false and misleading because they treated the installation costs as capital expenditures. Plaintiffs alleged Defendants violated section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, as well as Exchange Act sections 20(a) and 20(b), which impose liability on control persons. Defendants moved to dismiss the complaint. The district court granted the motion to dismiss based on Plaintiffs' failure to plead scienter as necessary to sustain their section 10(b) and Rule 10b–5 claims. The district court reasoned "the stronger inference is that [Defendants] believed they were accounting appropriately for the [Remediation] Obligations. . . . [T]he allegations here are largely premised upon hindsight and conduct that rises to the level of corporate mismanagement, but not severe recklessness." R. Doc. 61, at 27. It concluded, "when viewed in light of [Defendants'] explanations for their accounting decisions, the full and accurate disclosure of the values underlying their financial statements, the facts regarding the content of the May 8 restatement, the prompt correction of the May 8 revenue forecast, as well as the fact that [Defendants] themselves did not benefit financially from stock sales or in some other unusual way, [Plaintiffs'] allegations simply do not support a strong inference of scienter." R. Doc. 61, at 28. The district court dismissed Plaintiffs' section 20(a) and 20(b) claims because they are predicated on a section 10(b) claim. Plaintiffs now appeal.

## II.

### A.

"We review the district court's dismissal of a securities fraud complaint under the PSLRA *de novo* . . . ." In re Ceridian Corp. Sec. Litig., 542 F.3d 240, 244 (8th

Cir. 2008). "Although we construe the complaint liberally and accept the facts pleaded as true, we reject unwarranted inferences and conclusory or catch-all assertions of law." Elam, 544 F.3d at 926.

Section 10(b) makes it unlawful "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe." 15 U.S.C. § 78j(b). Rule 10b–5, in turn, forbids:

> any person, directly or indirectly, . . . (a) To employ any device, scheme, or artifice to defraud, (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

Responding to "perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers,'" Congress imposed heightened pleading requirements on section 10(b) plaintiffs through enactment of the PSLRA. Tellabs, 551 U.S. at 320 (quoting Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81 (2006)). The PSLRA requires a complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." 15 U.S.C. § 78u-4(b)(2)(A); see Tellabs, 551 U.S. at 313 ("The PSLRA requires plaintiffs to state with particularity . . . the facts evidencing scienter, *i.e.*, the defendant's intention to 'deceive, manipulate, or defraud.'" (quoting Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 & n.12 (1976))).

"Scienter requires a showing of 'reckless or intentional wrongdoing' . . . ." Elam, 544 F.3d at 928 (quoting Cornelia I. Crowell GST Trust v. Possis Med., Inc., 519 F.3d 778, 782 (8th Cir. 2008)).  It "'can be established in three ways: (1) from facts demonstrating a mental state embracing an intent to deceive, manipulate or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from allegations of motive and opportunity.'"[3] Id. (quoting Cornelia I Crowell GST Trust, 519 F.3d at 782).

We follow three prescriptions when determining whether a complaint sufficiently states facts giving rise to a strong inference of scienter.  First, we "accept all factual allegations in the complaint as true."  Tellabs, 551 U.S. at 322.  Second, we "consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice."  Id.  As noted above, Plaintiffs agree we may consider Patriot's SEC filings and its SEC correspondence.  Third, "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, [we] must take into account plausible opposing inferences."  Id. at 323.  This means we compare "plausible, nonculpable explanations for the defendant's conduct" with "inferences favoring the plaintiff."  Id. at 324.  An inference of scienter is strong—and thus a complaint will survive a motion to dismiss—"only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  Id.

---

[3]Severe recklessness means "'highly unreasonable omissions or misrepresentations that . . . present a danger of misleading buyers or sellers which is either known to the defendant, or is so obvious that the defendant must have been aware of it.'" Ceridian, 542 F.3d at 244 (alteration in original) (quoting Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 654 (8th Cir. 2001)).

B.

Plaintiffs argue they have shown a strong inference of scienter because: (1) Defendants violated Generally Accepted Accounting Principles ("GAAP"); (2) Defendants expensed all the ZVI technology's costs but then capitalized the Remediation Obligations' installation costs; (3) the SEC notified Defendants of their GAAP violations; (4) Defendants testified during the West Virginia environmental litigation about expensing costs; (5) Defendants possessed a strong motive to commit fraud; and (6) Defendants' statements after the May 8, 2012 restatement deceptively minimized the impact of the restatement. We disagree.

*GAAP Violations.* Plaintiffs maintain GAAP generally requires companies to expense environmental remediation costs incurred as a result of past mining operations and allows companies to capitalize such costs only to the extent they relate to ongoing operations or future exceedences. Thus Plaintiffs allege Defendants violated GAAP by capitalizing the Remediation Obligations' installation costs because, as Patriot's May 8, 2012 Form 8-K noted, the Remediation Obligations primarily "treat[ed] selenium exceedances in water discharges resulting from past mining under legacy permit standards." J.A. 314. Plaintiffs argue these GAAP violations support a strong inference of scienter. In particular, they suggest the magnitude of the GAAP violations—that is, the size of Patriot's restatement—demonstrates scienter.

"Section 10(b) and Rule 10b–5 prohibit fraud, not accounting malpractice." Ceridian, 542 F.3d at 246. Thus "[a]llegations of GAAP violations are insufficient to state a securities fraud claim unless coupled with evidence of corresponding fraudulent intent." Kushner v. Beverly Enters., Inc., 317 F.3d 820, 831 (8th Cir. 2003); see also Ceridian, 542 F.3d at 246 ("Because GAAP is an 'elaborate hierarchy' of sources that accountants consult, rather than a 'canonical set of rules,' pleading an amalgam of unrelated GAAP violations, without more, does not give rise to a strong

-11-

inference of scienter." (citation omitted) (quoting In re K-tel Int'l, Inc. Sec. Litig., 300 F.3d 881, 890 (8th Cir. 2002))). The fact that GAAP violations are allegedly significant does not change this rule and is insufficient by itself to give rise to a strong inference of scienter. See Fidel v. Farley, 392 F.3d 220, 231 (6th Cir. 2004) ("Allowing an inference of scienter based on the magnitude of fraud 'would eviscerate the principle that accounting errors alone cannot justify a finding of scienter.' It would also allow the court to engage in speculation and hindsight, both of which are counter to the PSLRA's mandates." (citation omitted) (quoting In re SCB Computer Tech., Inc. Sec. Litig., 149 F. Supp. 2d 334, 359 (W.D. Tenn. 2001))) overruled on other grounds by Tellabs, 551 U.S. 308 (2007).

Here, Plaintiffs fail to support their alleged GAAP violations with allegations of specific facts showing Defendants knew they should have expensed the costs for the Remediation Obligations or were reckless in doing so. We cannot infer scienter from the fact that Patriot initially told the SEC it expected the Remediation Obligations to address current and future selenium discharges and then later acknowledged the Remediation Obligations would address discharges from past mining operations. "[A] showing in hindsight that the statements were false does not demonstrate fraudulent intent." Kushner, 317 F.3d at 827; see also Elam, 544 F.3d at 927 ("[PSLRA] cannot be satisfied with allegations that defendants made statements 'and then showing in hindsight that the statement is false . . . .'" (quoting In re Navarre Corp. Sec. Litig., 299 F.3d 735, 743 (8th Cir. 2002))). Plaintiffs suggest Defendants violated Patriot's internal accounting policy, yet they fail to allege any particularized facts about Patriot's internal accounting policy. They allege that Patriot stated in its 2011 Form 10-K that it had recorded some costs associated with its environmental remediation efforts as expenses. See Elam, 544 F.3d at 927 ("[T]he PSLRA's falsity pleading requirement requires particularity."). However, Defendants' capitalizing the Remediation Obligations' installation costs while stating they had expensed other costs does not show fraud.

-12-

The inference of scienter is contradicted by the fact that Ernst & Young, Patriot's independent auditor, stated Patriot's financial documents complied with GAAP. It is also contradicted by the fact that Patriot, when pressed by the SEC to defend its accounting treatment, offered a thorough—if ultimately incorrect—explanation of its decision.[4] It is further contradicted by the fact that Patriot disclosed that it was corresponding with the SEC about its accounting treatment. Moreover, we agree with the district court that "[t]he facts were known to the market at all times, and [Plaintiffs'] inference of intent or recklessness does not account for why [Defendants] would set out to commit fraud while repeatedly and accurately explaining exactly how the company was treating the costs, including the exact amount of costs expected to be incurred." R. Doc. 61, at 18. Thus Defendants' GAAP violations do not support a strong inference of scienter.

*Treating Costs for the ZVI Technology As Expenses*. Plaintiffs argue we can draw a strong inference of scienter from the fact that Defendants treated the costs associated with the ZVI technology as expenses. Plaintiffs contend this shows

---

[4]One of Plaintiffs' arguments on appeal is that the district court erred because it used Patriot's SEC correspondence to establish "the truth of the matters asserted in [the correspondence]." Appellant Br. 15 n.5. At oral argument, Plaintiffs clarified that they believe we may use the correspondence to establish what Patriot told the SEC and that we may draw inferences based on the contents of the correspondence, but that we may not take Patriot's statements as true. Plaintiffs contend this means, for example, that we cannot use Patriot's statement that it believed it complied with ASC 410-30 to establish that Defendants in fact held that belief. Although we doubt the district court committed any error on this ground, we find it sufficient that we adhere to these principles in our de novo review. Here, for example, we do not use the correspondence to establish as a matter of fact that Defendants believed their explanation. Rather, we draw an inference of nonfraudulent intent where Defendants offered and then stood by a thorough explanation. We do not suggest that defendants may mask their fraud in a jumble of accounting principles and industry-specific jargon. But in this case, the more plausible inference based on Defendants' explanation is one of non-fraudulent intent.

Defendants understood GAAP required them to treat the Remediation Obligations' costs as expenses.

The problem with Plaintiffs' argument is they have failed to allege particularized facts showing Defendants knew the Remediation Obligations should have been treated the same as the ZVI technology. They allege simply that "Defendants knew that [Patriot] should have recorded costs associated with the Remediation Obligations as liabilities and corresponding expenses." R. Doc. 51, at ¶ 140. But "'[m]ere allegations of fraud are insufficient.'" Kushner, 317 F.3d at 827 (quoting Navarre, 299 F.3d at 742). The one case Plaintiffs rely on actually demonstrates their argument's weakness, which is that it "would require [us] to assume that the two sets of costs were of an identical nature, or at least, that the capitalized costs were of such a nature that Defendants' failure to recognize them as [expenses] amounted to recklessness." In re Bio-Tech. Gen. Corp. Sec. Litig., 380 F. Supp. 2d 574, 589 (D.N.J. 2005). Yet Plaintiffs pled no facts that would justify such an assumption. To the contrary, Plaintiffs alleged that Patriot installed the Remediation Obligations only after the ZVI technology proved ineffective, suggesting the two were not, in fact, the same. Thus Defendants' expensing the ZVI technology's costs does not support a strong inference of scienter.

*SEC Correspondence*. Plaintiffs argue the SEC notified Defendants of their GAAP violations and thus that Defendants' capitalization of the Remediation Obligations was knowingly false. However, the opposing inference of nonfraudulent intent is stronger for several reasons. The first is timing. Patriot initially disclosed it would capitalize the Remediation Obligations in an October 2010 press release. Yet Patriot's correspondence with the SEC did not begin until almost a year later, in September 2011. Even if the SEC *had* notified Defendants of their faulty accounting, Defendants would have been unaware of their mistake when they first capitalized the Remediation Obligations and thus could not have made knowingly false statements before September 2011.

More important, though, is that Plaintiffs have not demonstrated the SEC correspondence *did* notify Defendants their accounting was incorrect. The SEC's first letter asked Patriot to explain its accounting treatment, which Patriot did. The SEC's November 2011 letter asked for "clarif[ication]." Its January 2012 letter requested information "to better understand" Patriot's view. It was not until April 2012 that the SEC suggested Patriot *should* restate. And a month later that is what Patriot did. Throughout the eight-month dialogue, we note, Schroeder (along with Knibb, who was never named as a defendant in this suit) responded to the SEC's questions and defended Patriot's position as consistent with GAAP. Moreover, as the district court observed, "[t]here was never a formal inquiry or enforcement action by the SEC, nor any finding of misconduct or fraud." R. Doc. 61, at 15. Plaintiffs' allegations about the SEC correspondence do not support a strong inference of scienter. See Ceridian, 542 F.3d at 248-49 (reasoning that where SEC conducted an investigation but "no hearing or adverse findings ensued," the more compelling inference was that "SEC investigation uncovered no evidence of fraud").

*Testimony from West Virginia Litigation*. Plaintiffs allege that in August 2010—during proceedings that resulted in the West Virginia district court's order to install the Remediation Obligations—Schroeder testified he knew that Patriot assumed the Apogee and Hobet selenium discharge liabilities when it acquired the mines, that Patriot would record the liabilities on its balance sheet, and that some of the liabilities related to past mining operations. Plaintiffs argue this testimony shows Defendants "certainly understood that at least part of the Remediation Obligations were acquired liabilities that did not qualify as an asset and therefore should properly be expensed." Appellant Br. 45. However, Schroeder's testimony related solely to the remediation efforts Patriot took *before* the West Virginia district court ordered it to install the Remediation Obligations. The testimony does not support a strong inference of scienter regarding Defendants' later accounting for the Remediation Obligations.

*Motive*. Plaintiffs argue Defendants' desire to keep Patriot solvent and to maintain their compensation motivated them to commit fraud. "[M]otive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference." Tellabs, 551 U.S. at 325. However, "'[g]reed is a ubiquitous motive, and corporate insiders and upper management always have the opportunity to lie and manipulate.'" Fla. State Bd. of Admin. v. Green Tree Fin. Corp., 270 F.3d 645, 655 (8th Cir. 2001) (quoting Bryant v. Avado Brands, Inc., 187 F.3d 1271, 1286 (11th Cir. 1999)). Thus a desire "universally held among corporations and their executives . . . does not contribute significantly to an inference of scienter." Id. at 664; see also K-tel, 300 F.3d at 895 ("[G]eneral allegations of a desire to increase stock prices, increase officer compensation or maintain continued employment are too generalized and are insufficient."). Only allegations of an "unusual or heightened" motive may give rise to a strong inference of scienter. Green Tree, 270 F.3d at 660; see also Horizon Asset Mgmt. Inc. v. H & R Block, Inc., 580 F.3d 755, 766 (8th Cir. 2009) ("A complaint must show 'that the benefit to an individual defendant is unusual,' for example, that the benefit is of an 'overwhelming magnitude' and received under 'suspicious circumstances.'" (quoting In re Cerner Corp. Sec. Litig., 425 F.3d 1079, 1085 (8th Cir. 2005))).

Here, while it is true Patriot filed for bankruptcy several months after issuing its financial restatement, Plaintiffs fail to allege specific facts showing that Defendants' "careers and the very survival of [Patriot] were at stake." Appellant Br. 49. Patriot stated that several factors influenced its decision to file for bankruptcy, including reduced demand for coal, the cost of regulatory compliance, and weak international and domestic economies. It acknowledged that rising environmental expenditures constrained its liquidity and financial flexibility immediately before the bankruptcy filing, but never that the Remediation Obligations—which it had begun capitalizing nearly two years before the bankruptcy filing—posed a "catastrophic threat," as Plaintiffs claim. Indeed, Plaintiffs' argument is contradicted by Patriot's disclosing how much the Remediation Obligations would cost and how it would

-16-

account for those costs, as well as by Patriot's disclosure that it was corresponding with the SEC about its accounting treatment. Thus Defendants' alleged desire to maintain Patriot's survival in order to receive compensation does not present an unusual or heightened motive and does not support a strong inference of scienter. See Elam, 544 F.3d at 927 ("[T]he PSLRA's falisty pleading requirement requires particularity.")

*May 2012 Statements*. Finally, Plaintiffs' argue Defendants made knowingly deceptive statements in the three Form 8-Ks Patriot filed in May 2012. First, Plaintiffs point to the statement in the May 8, 2012 Form 8-K indicating the restatement "has no impact on [Patriot's] revenue or Adjusted EBITDA for any . . . period" of restatement. R. Doc. 51, at ¶ 54. Plaintiffs do not dispute this statement was literally true, but they argue it was deceptive because it conveyed the impression that the restatement was of minimal significance. However, Patriot prefaced this statement with a sentence explaining that the "restatement is increasing Patriot's asset retirement obligation expense and net loss by $23.6 million and $49.7 million for the years ended December 31, 2011 and 2010, respectively." J.A. 314. We agree with the district court that we "cannot infer scienter from an admittedly accurate statement that was fronted with the concession that the company had just recorded massive net losses." Memorandum, R. Doc. 61, at 20.

Second, Plaintiffs argue we can infer that the sales forecast announced in the May 8, 2012 Form 8-K was knowingly deceptive because Patriot revised the sales forecast a week later. While "the close proximity between" an allegedly fraudulent statement and a later inconsistent statement is "relevant to scienter," "'[w]ithout more, inferring scienter from [ ] temporal proximity . . . is nothing more than speculation.'" Elam, 544 F.3d at 930 (second and third alterations in original) (quoting Fidel, 392 F.3d at 232). Thus the temporal proximity between the May 8 forecast and its May 15 revision does not support "a strong inference of scienter because [P]laintiffs'

'allegations rest on nothing more than hindsight.'" Id. (quoting Fidel, 392 F.3d at 232)).

Third, Plaintiffs argue Whiting's letter to Patriot employees, included in the May 22, 2012 Form 8-K, "was falsely positive" because while "Whiting hinted at doubts about [Patriot's] prospects, he did not disclose the full seriousness of the situation or the looming threat of bankruptcy." Appellant Br. 54. Plaintiffs pled no facts, however, showing Defendants knew on May 22, 2012, that bankruptcy was in fact looming. Instead, they ask us to speculate that Defendants must have known Patriot was at risk of bankruptcy because Patriot had just issued a restatement. In the absence of specific facts showing Defendants knew of Patriot's impending bankruptcy, however, the stronger inference is one of nonfraudulent intent.

In sum, accepting all factual allegations in Plaintiffs' complaint as true and considering the complaint in its entirety,[5] we find the pleaded facts do not give rise to a strong inference of scienter. We agree with the district court that "the allegations here are largely premised upon hindsight and conduct that rises to the level of corporate mismanagement, but not severe recklessness." R. Doc. 61, at 27. Thus the district court correctly dismissed Plaintiffs' claims under section 10(b) and Rule 10b–5. Because Plaintiffs' section 20(a) and 20(b) claims are not actionable absent a separate violation of the Exchange Act, the district court correctly dismissed these claims as well. See 15 U.S.C. § 78t(a)-(b).

---

[5]Plaintiffs argue the district court failed to consider the complaint in its entirety. This argument lacks merit, however, because the district court explicitly discussed Plaintiffs' "cumulative allegations." R. Doc. 61, at 27-28; see also Ceridian, 542 F.3d at 246 ("This argument is frequently made but rarely persuasive.").

## III.

For the foregoing reasons, we affirm the dismissal of Plaintiffs' complaint.

_____