# United States Court of Appeals

## For the Eighth Circuit

_____

No. 16-1161

_____

Kenneth Graham, on behalf of himself and all others similarly situated

*Plaintiff - Appellant*

v.

Catamaran Health Solutions LLC, formerly known as Catalyst Health Solutions, formerly known as Healthextras Inc.; Healthextras LLC; Alliant Services Houston Inc.

*Defendant*s

Stonebridge Life Insurance Company

*Defendant - Appellee*

Virginia Surety Company Inc.

*Defendant*

_____

Appeal from United States District Court
for the Eastern District of Arkansas - Little Rock

_____

Submitted: June 7, 2017
Filed: August 23, 2017

_____

Before LOKEN, MURPHY, and MELLOY, Circuit Judges.

_____

MELLOY, Circuit Judge.

Plaintiff Kenneth Graham, on behalf of himself and others similarly situated, alleges the defendant insurance companies and marketing organizations advertised and sold group disability insurance policies that were void *ab initio* due to a failure to comply with applicable Arkansas insurance law. He seeks reimbursement of premiums, enhanced damages, and fees, alleging claims of unjust enrichment, breach of contract, and civil conspiracy. The district court granted a motion to dismiss, concluding the policies were not void *ab initio* because an Arkansas savings statute applied and thus rendered the policies enforceable even if not in compliance with Arkansas law. See Ark. Code Ann. § 23–79–118. The district court held in the alternative that Graham's claims were time-barred. We affirm.

I.

Group insurance policies differ from individual insurance policies in that individual underwriting is not required for group policies. Rather, by offering a one-size-fits-all policy to members of a qualifying group (typically, employees of a company or members of an organization formed for purposes separate and apart from obtaining insurance), the insurer accepts that individualized risks will be spread throughout the members of the group thus permitting group pricing. Often, the actual policyholder is the group itself and the insured members receive only a certificate of coverage rather than a copy of the policy.

Consistent with this theory and practice, the group itself is the "consumer" who is presumed to comparison shop among insurers on behalf of its members to find policies deemed valuable and appropriate. In part to prevent lapses in this practical protective function, many states have passed laws defining what may qualify as an insurable group. These states typically require registration of insurers and state

-2-

approval of group policy forms under statutory or regulatory regimes that grant various enforcement mechanisms to the state.

At issue in the present suit are allegations that a marketing entity, HealthExtras, Inc., along with other entities, including different insurers, conspired to skirt these practical and statutory group-policy protections. In broad strokes, Graham alleges HealthExtras solicited names from credit-card issuers and advertised group accidental disability policies to card holders even though these card holders were not members of any stand-alone group created for a purpose apart from obtaining insurance. HealthExtras then sold group policies to the interested card holders and billed card holders through recurring charges on their cards. According to Graham, the policies at issue were void *ab initio* because the insurers failed to comply with an Arkansas statute defining permissible and qualifying "groups." Ark. Code Ann. §§ 23–86–101 & 23–86–106(2)(A)(iii). He also alleges the defendants illegally failed to comply with a statutory registration requirement. Id. §§ 23–86–102(b) & 23–79–109. Graham's complaint, read as a whole, alleges in the alternative that, to the extent the policies were not void, they actually provided very little coverage at a vastly inflated price. According to Graham, the conspiracy to skirt group insurance protections was successful in that the card holders did not receive the benefit of oversight by either state regulators or by a representative "group" that could have shopped for fair coverage at a fair price.

Graham purchased coverage in 2001 and continued paying for coverage until policy termination in December 2014. On October 6, 2014, Graham filed the present class-action complaint, naming as a proposed class persons who had purchased policies marketed by HealthExtras between 1999 and the time of filing, subject to certain exclusions. Graham named as defendants the marketing organizations that spearheaded the insurance program and two insurance companies that served as underwriters, Virginia Surety Company, Inc., and Stonebridge Life Insurance

Company ("Stonebridge"). The complaint raised four counts: violation of the Arkansas Trade Practices Act, unjust enrichment, conversion, and civil conspiracy.

In November 2014, after Graham filed his suit, the defendants canceled the group policy via letter, effective December 31, 2014, stating:

> Thank you for being a long standing customer of the HealthExtras Program. We are writing to notify you that the respective insurance coverages in the Program, underwritten by Stonebridge Life Insurance company ("Stonebridge Life") and Virginia Surety Company ("Virginia Surety"), are terminating as of December 31, 2014. As a result, we regret that we cannot continue the HealthExtras Program.

In December 2014, the marketing organizations and both insurance companies filed separate motions to dismiss, challenging Graham's standing and challenging the sufficiency of his pleadings. In their standing arguments, the defendants asserted that Graham and the proposed class had not filed claims under their policies, the policies were enforceable pursuant to the Arkansas savings statute, and Graham and the proposed class, therefore, had not suffered any redressible injury. According to the defendants, Graham and the proposed class members paid for and received enforceable insurance, and the absence of claims meant allegations of invalidity were mere abstractions rather than concrete and particularized injuries.

In its briefing to the district court, however, at least one defendant referenced the fact that Graham had made a claim on a HealthExtras policy. Stonebridge identified a prior federal district court lawsuit in which Graham alleged total disability and contested a claim denial by Stonebridge. In fact, Stonebridge asked for reassignment of the present case to the district court judge who had presided over that earlier lawsuit between Graham and Stonebridge. See Graham v. Stonebridge Life Ins. Co., No. 4:10-CV-02022-JHL (filed in state court Oct. 29, 2010, and removed to

the United States District Court for the Eastern District of Arkansas on December 17, 2010).[1]

On January 7, 2015, Graham filed a first amended complaint in the present case, eliminating his claim under the Arkansas Trade Practices Act and raising instead a breach-of-contract claim. He asserted the defendants' termination of the policy was a breach of contract and alleged Stonebridge had sent the termination letter. Graham did not attach a contract to his original complaint or to his first amended complaint. In addition, he alleged no detailed facts about the insurance policy's termination provisions. Nor did he expressly allege that the insurance policy imposed a duty on Stonebridge to continue its policy indefinitely. Rather he alleged Stonebridge "sold . . . a policy," "canceled the HealthExtras Policy," and such "actions constitute breach of contract." He did, however, identify the insurance contract by policy and form number and allege that a coverage description had disclosed limitations on coverage. See First Amended Complaint, ¶ 58 ("Stonebridge underwrote and issued the Policy

---

[1]Even when addressing a motion to dismiss, we may take judicial notice of filings of public record and the fact (but not the veracity) of parties' assertions therein. Roe v. Nebraska, 861 F. 3d 785, 788 (8th Cir. 2017) ("In addressing a motion to dismiss, the court may consider the pleadings themselves, materials embraced by the pleadings, exhibits attached to the pleadings, and matters of public record. A district court may consider these materials without converting the defendant's request to a motion for summary judgment." (citations and internal quotation marks omitted)); Lustgraaf v. Behrens, 619 F.3d 867, 885–86 (8th Cir. 2010) ("[W]hen considering a motion to dismiss . . ., [a court] may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents . . . ." (alterations in original) (emphasis omitted)). For example, in Podraza v. Whiting, 790 F.3d 828, 833 (8th Cir. 2015), a case asserting securities fraud, our court took judicial notice of a party's representations made in SEC filings. In any event, in the present case, after Stonebridge directed the district court's attention to the prior litigation, Graham presented no arguments suggesting it might be impermissible to consider the prior litigation.

number 25649 GM956 and Form 59U9B4921 to the Plaintiff and other Arkansas residents for disability coverage without ever having applied for approval with the Arkansas Department of Insurance."); id., ¶ 55 ("Although the coverage description disclosed some limitations on coverage under the policy . . . [no] Defendant[s] ever disclosed the purported disability coverage was illusory."). The policy and form numbers he identified are the same as those provided to the court in the earlier lawsuit. See supra note 1.

On January 26, 2015, the defendants filed motions to dismiss the first amended complaint. They renewed the arguments from their first round of motions to dismiss and again challenged Graham's standing. In addition, they argued Graham failed to state a claim for breach of contract under the plausibility standard of Bell Atlantic Corporation v. Twombly, 550 U.S. 544, 555 (2007), because he did not allege specific facts concerning a contractual duty to continue coverage. Virginia Surety attached to its motion a sample policy and argued the attached policy was embraced by the pleadings and could be considered by the court.[2] Graham, in response,

_____

[2]After briefing was completed in our court for the present appeal, the parties notified the court of a settlement with all defendants other than Stonebridge. We granted permission to dismiss the appeal as to the defendants who settled, and Stonebridge is the only remaining defendant. The first amended complaint, however, does not clearly allege which particular defendant took which particular actions. Further, it is undisputed that Virginia Surety had provided one type of insurance whereas Stonebridge had provided a different type of insurance. In its motion to dismiss, Virginia Surety attached a document it characterized as a HealthExtras policy, but the policy identifies as the underwriter "National Union Insurance Company of Pittsburgh, PA."

As an aside, we note Graham also sought coverage under a policy issued by Hartford Life and Accident Insurance Company. That claim for coverage resulted in federal litigation leading to an appeal to our court. See Graham v. Hartford Life & Accident Ins. Co., 677 F.3d 801 (8th Cir. 2012). The Eighth Circuit opinion in that case made no reference to the Hartford policy being a part of the HealthExtras

-6-

attached a sample Stonebridge policy he identified as the policy Stonebridge had asserted as controlling in the prior action between Graham and Stonebridge.

In briefing, the parties placed primary emphasis on the question of whether the Arkansas saving statute applied. The district court held the statute applied and prevented the policy from being deemed void *ab initio*. In addition, the district court, "in the alternative," dismissed all claims as time barred without additional explanation. Plaintiffs appeal.

## II.

### A. Standing

On appeal, Stonebridge challenges Article III standing. Stonebridge asserts the class excludes persons who made claims on their policies and the policies were enforceable pursuant to state law.[3] According to Stonebridge, class members paid for

---

program. The opinion makes clear, however, that the injury alleged was the same injury at issue in the earlier Stonebridge case, a July 5, 2005 accident allegedly resulting in total blindness.

[3]The class definition and Graham's eligibility to serve as representative are unclear. The class definition, phrased in terms of "persons," lists several exclusions that are not defined in terms of "persons." For example, the definition excludes "[c]laims for personal injury, wrongful death and/or emotional distress" and "[a]ctual identifiable claims for disability benefits that have already arisen that may be payable under the terms of said disability insurance policies." As noted, however, Graham made a claim on a HealthExtras policy alleging total blindness resulting from an accident. See supra note 1. Notwithstanding Stonebridge's and Graham's knowledge of this past litigation, all parties' arguments as to standing in the present case appear to adopt the position that Graham and the proposed class members had not filed claims on their HealthExtras policies.

and received insurance, but because class members did not make claims on their policies, they did not suffer any concrete and particularized redressible injuries.

We conclude Graham has standing for two reasons. First, as to Graham's theory that the policies were void *ab initio,* Stonebridge's standing argument relies on the application of the Arkansas savings statute. Ark Code Ann. § 23–79–118. Stonebridge asks us, in essence, to resolve the claims on the merits en route to determining standing. A standing analysis, however, permits cursory examination of a plaintiff's legal theories only to the extent necessary to understand what is asserted, whether the plaintiff has properly *alleged* an injury that is fairly traceable to the named defendants, and whether that injury can be redressed by a judgment against those defendants. See Duit Constr. Co. v. Bennett, 796 F.3d 938, 940 (8th Cir. 2015) ("Standing requires (1) an injury that is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) that the injury be fairly traceable to the challenged action of the defendant, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." (quoting Turkish Coal. of Am., Inc. v. Bruininks, 678 F.3d 617, 621 (8th Cir. 2012))). Standing analysis does not permit consideration of the actual merits of a plaintiff's claim. See Am. Farm Bureau Fed'n v. U.S. Envtl. Prot. Agency, 836 F.3d 963, 968 (8th Cir. 2016) ("The standing inquiry is not, however, an assessment of the merits of a plaintiff's claim. In assessing a plaintiff's Article III standing, we must assume that on the merits the plaintiffs would be successful in their claims." (citations and internal quotation marks omitted)). Therefore, if a claim presents a question of statutory interpretation under which one interpretation leads to possible relief and the other does not, standing exists. See id. ("[W]hether a statute has been violated 'is a question that goes to the *merits . . .* and not to constitutional standing.'" (second alteration in original) (quoting Muir v. Navy Fed. Credit Union, 529 F.3d 1100, 1105–06 (D.C. Cir. 2008))). We therefore conclude that, if the policy is deemed void *ab initio* due to non-compliance with state law, then Graham will have suffered a

compensable economic injury fairly traceable to the defendants' actions. Whether the policies actually were void goes to the merits, not the threshold standing analysis.

Second, as to allegations of injury even if the policies were not void, standing exists. Although the complaint and its demands for relief are by no measure clear, we understand Graham to allege that defendants (1) wrongfully terminated the policy as an act of breach; (2) conspired to sell the policy in the absence of a qualifying group; and (3) sold a policy different than advertised at an inflated price while shielding that fact from any group oversight or state regulation. Graham alleges the overwhelming majority of money he paid as premiums did not pay for insurance, and he seeks "an order of restitution and all other forms of equitable monetary relief." As just noted, whether such claims may succeed on the merits is a question separate and apart from our standing analysis. Id. Taken in the light most favorable to Graham, we understand his claims to seek a refund of all or at least some portion of premiums paid. Therefore, even if the policy were deemed enforceable, and Graham could recover only a portion of his premiums, he has described a concrete and redressible economic injury properly alleged to have been caused by the present defendants. As to such claims, we conclude Graham has constitutional standing. See Carlsen v. GameStop, Inc., 833 F.3d 903, 908-09 (8th Cir. 2016) (addressing standing in the context of claims asserting a theory of overpayment and emphasizing "[i]t is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action, for the concepts are not coextensive." (quoting ABF Freight Sys., Inc. v. Int'l Bhd. of Teamsters, 645 F.3d 954, 960 (8th Cir. 2011) (alteration in original))); Wallace v. ConAgra Foods, Inc., 747 F.3d 1025, 1029 (8th Cir. 2014) ("When the alleged harm is economic, the injury in fact question is straightforward." (citation and internal quotation marks omitted)).

## B. Statute of Limitations

Graham has abandoned his conversion claim and his Arkansas Trade Practices claim. What remains are two claims (unjust enrichment and civil conspiracy) alleging a conspiracy to sell policies of little or no value through a non-qualifying group and one claim alleging breach of contract due to wrongful termination.

Claims for unjust enrichment in Arkansas are subject to a three-year statute of limitations. See Ark. Code Ann. § 16–56–105. Civil conspiracy in Arkansas is not a stand-alone claim; rather, claims alleging civil conspiracy are governed by the applicable statute of limitations for the underlying wrong that is the object of the conspiracy. See Varner v. Peterson Farms, 371 F.3d 1011, 1016 (8th Cir. 2004) ("civil conspiracy . . . borrows its statute of limitations"). The limitations period commences upon occurrence of the wrongful act. See id.; see also Quality Optical of Jonesboro, Inc. v. Trusty Optical, L.L.C., 225 S.W.3d 369, 372 (Ark. 2006) (noting the limitations period is triggered "when the injury occurs, not when it is discovered"). Further, Arkansas has repeatedly and consistently rejected any continuing-tort theory outside the context of continuing medical treatment surrounding medical malpractice claims. See Quality Optical, 225 S.W.3d at 372 ("As we have repeatedly stated, this court does not recognize a 'continuing tort' theory."); Chalmers v. Toyota Motor Sales, USA, Inc., 935 S.W.2d 258, 264 (Ark. 1996) ("[W]e have specifically rejected the continuing-tort theory of tolling the statute of limitations as inconsistent with the General Assembly's intent in stating that limitations begin to run at the date of the wrongful act complained of and no other time." (citation and internal quotation marks omitted)). In Chalmers, for example, the Arkansas Supreme Court rejected a continuing-tort theory as to claims of civil conspiracy in the context of a business relationship even though the alleged conspiracy and business relationship were ongoing when suit was filed. 935 S.W.2d at 263–64. Notwithstanding the ongoing nature of the allegedly wrongful conduct,

the court in Chalmers held the statute of limitations began to run when the allegedly wrongful conduct began, many years prior to suit. Id.

Here, Graham filed suit in October 6, 2014. Therefore, if his claims accrued prior to October 6, 2011, his claims are untimely. He alleges the marketing, underwriting, and purchase of his policy occurred in 2001. Although he continued paying premiums through 2014, the inapplicability of the continuing-tort theory makes the ongoing nature of his payments and the insurance relationship immaterial. The defendants have met their burden of raising the limitations period as a defense and establishing when the limitations period commenced. Chalmers, 935 S.W.2d at 261 (recognizing that the defendant's satisfaction of its burden may be "clear from the face of the complaint").

The concealment of a wrong through misrepresentations, however, may toll the limitations period. See id. at 261–62; Varner, 371 F.3d at 1016–17 ("Where affirmative acts of concealment by the person charged with fraud prevent the discovery of that person's misrepresentations, the statute of limitations will be tolled until the fraud is discovered or should have been discovered with the exercise of reasonable diligence."). Graham, as the plaintiff, bears the burden of establishing the applicability of this tolling theory. Chalmers, 935 S.W.2d at 261 ("[T]he burden shifts to the plaintiff . . . ."). Here, Graham alleges the defendants' overall scheme employed the practical dynamics of group insurance to effectively conceal the non-qualifying nature of the group and to avoid scrutiny of the allegedly overpriced or wholly valueless nature of the policies. The core of his allegation is a theory of concealment through systematic evasion of statutory disclosure and registration requirements. See Ark. Code Ann. §§ 23–86–101 & 23–86–106(2)(A)(iii); id. §§ 23–86–102 & 23–79–109.

Even assuming Graham's allegations of concealment suffice to toll the limitations period, the limitations period could only be tolled until such time that he

learned of the wrong or was placed on objective notice of the need to investigate the matter. Varner, 371 F.3d at 1017 ("Concealment of facts, no matter how fraudulent or otherwise wrongful, has no effect on the running of a statute of limitations if the plaintiffs could have discovered the fraud or sufficient other facts on which to bring their lawsuit, through a reasonable effort on their part."). This requirement is fatal to Graham's arguments. He alleges he was provided a certificate of insurance identifying at least some exclusions soon after obtaining coverage. Further, the documents of public record in his prior lawsuit demonstrate he submitted a claim in 2006 that Stonebridge denied the same year. Graham's claim was not inconsequential; he sought $1,000,000 alleging disability in the form of total blindness. At that time, through his unsuccessful interactions with the insurer, he was on notice of a need to examine the parameters of his coverage. It had become clear that he did not receive the insurance he now alleges he thought he had purchased. It was not until almost eight years later that he commenced the present action alleging claims of civil conspiracy and unjust enrichment concerning that insurance—allegations rooted in a theory that the insurance contained overly harsh exclusions and did not actually provide valuable coverage. Obtaining the policy for review or simply contacting the state's director of insurance any time after the 2006 denials would have revealed the infirmities he now alleges as the basis for his claims. Because no tolling can be found after 2006, his claims are untimely.

Turning to Graham's breach-of-contract claim, the allegedly wrongful act was the termination itself. This act occurred in November or December 2014, after Graham filed his original complaint but before he filed his first amended complaint. This claim, added after the initial filing of suit and based on an act that occurred after the initial filing, cannot be deemed time barred.

## C. Failure to State a Claim

Stonebridge argues Graham fails to meet the minimal requirements of Twombly because he did not allege an ongoing contractual duty to maintain coverage indefinitely. Graham counters that he adequately alleged a breach of contract claim and argues that Stonebridge improperly seeks to rely on the contract language in the National Union policy submitted by Virginia Surety. That policy grants the insurer an unconditional right to terminate the policy on thirty-days' notice.

The parties' arguments as to this issue are somewhat misplaced. Graham himself, in the district court, submitted a Stonebridge policy as an attachment to his February 16, 2015 "Consolidated Response in Opposition to Defendants' Motions to Dismiss Plaintiff's Class Action Complaint." That policy unambiguously grants the insurer the same termination rights as the National Union policy, and by Graham's own allegations, Stonebridge provided the requisite thirty-days' notice. We therefore conclude Graham's breach-of-contract claim fails as a matter of law.

For the reasons stated herein, we affirm the judgment of the district court.

_____